UNITED STATES of America,
Plaintiff–Appellee,

v.

Sherrie Tuggle APPLE,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Stacy Nevin APPLE, a/k/a Dr. Stachel
Pomme, Defendant–Appellant.

Nos. 89–5066, 89–5423.

United States Court of Appeals,
Fourth Circuit.

Argued May 11, 1990.

Decided Oct. 2, 1990.

As Amended Nov. 6, 1990.

John Kenneth Zwerling, argued, Zwerling, Mark & Sutherlund, P.C., Alexandria, Va., for defendants-appellants.

Miriam Aroni Krinsky, Asst. U.S. Atty., argued, Baltimore, Md. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before WIDENER and PHILLIPS, Circuit Judges, and SMITH, Senior Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

PHILLIPS, Circuit Judge:

Stacy and Sherrie Apple were each convicted on multiple felony narcotics counts, Sherrie after a jury trial and Stacy upon his guilty plea.[1] Both appellants had filed various pre-trial motions relating to allegedly illegal electronic surveillance; the district court denied all the motions. On appeal, the Apples challenge the district court's rulings on their pre-trial motions and adverse rulings made by the court at their respective sentencing hearings. We find no error in the district court's disposition of Stacy's pre-trial motions. The court, however, erred in rejecting Sherrie's motions, and we must remand her case for further proceedings. The district court also failed to make factual findings that would support enhancement of the Apples' sentences for possession of a firearm during the commission of a drug offense; we therefore remand that issue to the district court.

I

In late 1986, Montgomery County, Maryland, police obtained information from anonymous sources that Stacy was involved in narcotics trafficking. A letter from another anonymous source implicating Stacy in narcotics trafficking was circulated among several FBI offices in early 1987. Stacy's name had also surfaced dur-ing a joint federal-state investigation in the Charlottesville, Virginia, area. The phone of Trevis Poole was tapped by Virginia State Police, and on information obtained through the wiretap Poole and others were indicted and eventually convicted. Stacy was identified during the grand jury inquiry as one of Poole's narcotics suppliers. FBI agents involved in the Virginia investigation passed along to FBI agents in Maryland the information implicating the Apples; that information was also passed along to the Montgomery County Police.

Local and federal authorities intensified their investigation of the Apples, contacting informants and securing a pen register tap on the Apples' home phone. The Montgomery County Police eventually obtained sufficient information to seek a search warrant for the Apples' home. The police obtained the warrant and executed it on August 14, 1987, seizing, *inter alia*, four handguns,[2] a small quantity of marijuana, drug paraphernalia, and assorted records. Stacy was then arrested for conspiracy to distribute cocaine.[3]

The federal investigation of the Apples continued. An informant introduced an undercover FBI agent to the Apples. The agent purchased and arranged for the distribution of narcotics, often in meetings held at the Apples' New York City apartment. Based on the activities of the undercover agent and information attributed to confidential informants unrelated to the Virginia investigation, the FBI sought and obtained a warrant to search the Apples' apartment on May 20, 1988. Upon execution of this warrant, federal officials seized assorted documents and records, and one handgun. Stacy was arrested by federal authorities the next day on the street in front of the New York apartment. Sherrie, who had apparently separated from her husband several weeks earlier, voluntarily

---

1. For convenience, we will refer to the appellants by their first names.

2. Two of the handguns apparently were found on a bookshelf in an office in the home, another was found in a box in the foyer, and the fourth was found in a basement room. At least two of the guns apparently were loaded.

3. The state criminal charge was subsequently dismissed by the state's attorney.

surrendered to authorities approximately two weeks after Stacy had been arrested.

A grand jury in the district of Maryland indicted the Apples and two others on multiple felony counts. The Apples were charged in two separate conspiracy counts—count one charged conspiracy to distribute and possess with intent to distribute cocaine during the period from January 1986 until May 20, 1988; count two charged conspiracy to distribute and possess with intent to distribute marijuana from January 1988 until May 20, 1988.[4] Both were also charged in counts three through five with distribution of cocaine on certain dates in 1988,[5] in count six with attempt to possess cocaine with intent to distribute,[6] in count seven with possession of cocaine with intent to distribute,[7] and in count nine with use of a telephone in facilitating the commission of a felony.[8]

Sherrie filed related pre-trial motions (for disclosure of electronic surveillance, expanded discovery, extension of time to complete discovery, suppression of evidence seized in the Maryland search, and to quash the indictment) seeking information about the electronic surveillance in Virginia. She specifically identified the Poole phone tap, but did not identify any phone calls with the suspect phone during the period of the surveillance. She did aver that she heard unusual noises on her phone and noticed unexplained interruptions of service. The government argued that Sherrie had failed to make the necessary prima facie showing to trigger the government's obligation to affirm or deny the occurrence of the alleged unlawful surveillance under 18 U.S.C. § 3504(a)(1), but the government also submitted a letter from the Department of Justice indicating that a check by the FBI and other federal agencies revealed no surveillance of the Apples.

The district court did not rule on the question of the legality of the Virginia phone tap.[9] Rather, assuming *arguendo* that the wiretap was illegal, the court ruled that Sherrie lacked standing to raise the electronic surveillance issue because she had failed to show that she was an "aggrieved person" under 18 U.S.C. § 2510(11) by failing to show that she was a party to any of the intercepted Virginia phone conversations. The court also ruled, alternatively, that there was sufficient evidence developed independently of the Virginia investigation to support probable cause for the Maryland search warrant; other evidence to be presented at trial was also unrelated to the Virginia investigation.

On the eve of her trial,[10] Sherrie moved the court to reconsider its rulings. She presented her own affidavit and the affidavit of Patty Poole, Trevis Poole's sister-in-law, which indicated that Sherrie had made a call to the tapped number during the period of the surveillance and that both she and Stacy had left messages on other occasions. A hearing was held on the motion to reconsider. Though it noted that the new affidavits did not identify the specific dates of the calls or their content, the court indicated that it "appear[ed]" that Sherrie had made a prima facie showing of illegal surveillance. Citing the Department of Justice letter, the court ruled that the government had denied that the Apples were surveilled and that there was no reason to order additional disclosure. FBI case agent Patrick Patterson and Officer Scott Hammond, the principal Montgomery County Police officer involved in the investigation, each testified at the hearing that he had received information from the Virginia investigation, but each was personally unaware of any intercepted conversations involving the Apples. The court also credited the testimony of Agent Patterson to the effect that the Assistant United States Attorney (AUSA) involved in the Virginia investiga-

---

4. *See* 21 U.S.C. § 846.

5. *See* 21 U.S.C. § 841(a)(1).

6. *See* 21 U.S.C. § 846.

7. *See* 21 U.S.C. § 841(a)(1).

8. *See* 21 U.S.C. § 843(b).

9. The legality of the Poole wiretap has never been determined in either federal or state court.

10. Sherrie's trial had been severed by the district court. *See* Fed.R.Crim.P. 14.

tion had told him (Patterson) that to his (the AUSA) knowledge, none of the wiretapped phone conversations involved the Apples.

After a jury trial, Sherrie was convicted on all five felony counts presented to the jury.[11] At her sentencing, the court enhanced Sherrie's Guidelines base offense level by two levels under United States Sentencing Guidelines (U.S.S.G.) § 2D1.1(b)(1) for possession of a firearm during the commission of a drug offense, finding that Sherrie "was well-aware of the existence of firearms in her home." The court then found that a downward departure under *id.* § 5K2.13, p.s. was appropriate to reflect Sherrie's diminished capacity.[12] The court departed downward from the applicable Guidelines range of 151 to 188 months and imposed a sentence of 84 months.

After Sherrie was convicted and shortly before he was to be tried, Stacy entered into a plea agreement with the government. Earlier, he too had claimed that he was the victim of illegal electronic surveillance[13] pointing to grand jury testimony, which indicated that Stacy spoke regularly with Trevis Poole, and the affidavit of his counsel, in which counsel averred that Stacy had indicated that he had telephoned the Pooles during the period that Trevis Poole's phone was tapped. The district court, relying on its earlier rulings, held that Stacy lacked standing to raise the issue and alternatively that there was sufficient evidence developed independently from the Virginia investigation.

Stacy then entered a Fed.R.Crim.P. 11(a)(2) conditional plea of guilty to counts one, two, four, and six of the indictment. Because Stacy objected to certain specific statements in the government's proposed statement of facts, which was incorporated into the plea agreement, he changed four statements of "fact" to indicate rather that a given witness would testify to those facts. He also struck the reference in the plea agreement itself that he agreed with the statement of facts.[14]

While Stacy was incarcerated awaiting sentencing, he was diagnosed as suffering from large cell lymphoma. The cancer was successfully treated with radiation and chemotherapy, and it was in remission at the time Stacy was sentenced. Two physicians testified at Stacy's sentencing hearing that he had approximately a 70% chance of long-term survival without recurrence of the cancer. Stacy moved at his sentencing hearing for downward departure based on his illness, but the court denied the motion. The court observed that:

> The final and perhaps most significant issue before the Court in these sentencing proceedings is whether there are mitigating factors which would require the Court to depart and give a sentence below the guideline range which the Court has determined. *See* Section 5K2.0. Although defendant is indeed suffering from a serious and perhaps life-threatening disease, I am not satisfied, after hearing the evidence and after considering the record, that the defendant is entitled to a downward departure. It is not, in the opinion of this Court, grounds for departure that defendant contracted a serious disease after committing these crimes.
>
> He is presently in remission, the long-term prognosis is good, and if there is a relapse, he can receive adequate monitoring and treatment for his cancer at appropriate federal medical facilities. The fact that there is a possibility that he might not survive during the period of his incarceration is not in my opinion

---

**11.** The government had dismissed counts three, four, and five prior to the trial.

**12.** The court found that Sherrie suffered from chronic depression and was a battered wife.

**13.** The district court had granted Stacy's motion to adopt Sherrie's motions on the electronic surveillance issue.

**14.** The relevant sentence in the plea agreement read: "This Office [United States Attorney] and Mr. Apple understand, agree and stipulate to the statement of facts attached hereto and incorporated herein." Joint Appendix (J.A.) at 908.

grounds for a downward departure under all the facts here.

J.A. at 797–98.

Stacy raised two other issues at his sentencing. He sought the two level reduction in base offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. The court found, however, that Stacy had not affirmatively accepted personal responsibility for his offenses. The court noted that his guilty plea alone did not justify the reduction, that Stacy had not cooperated with the government, and that he did not agree to the government's statement of the facts, having struck the word "agree" from the plea agreement. The court also enhanced Stacy's base offense level two levels pursuant to Guidelines § 2D1.1(b)(1) to reflect his "possession" of a firearm during the commission of a drug offense. The court noted simply that one or more firearms had been found in the Apples' residences in Maryland and New York. The court sentenced Stacy to 220 months, near the bottom of the applicable Guidelines range of 210–262 months.

This appeal followed.

## II

Appellants first challenge the district court's rulings on the electronic surveillance issue. Stacy argues that the court erred in holding that he lacked standing to raise the issue. Both appellants contend that the court erred when it accepted the government's denial that conversations involving the Apples had been intercepted. Finally, the Apples charge that the taint hearing held by the court was meaningless and its subsequent independent source ruling fundamentally flawed because they never had access to the recordings from which they could determine whether the relevant evidence was tainted by the illegal electronic surveillance.

## A

Congress enacted a comprehensive scheme for the regulation of wiretapping and electronic surveillance in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. No. 90–351, 82 Stat. 211 (1968); *see Gelbard v. United States*, 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). Title III provided, *inter alia,* that wire and oral communications intercepted in accordance with the mandated procedures could be disclosed and used under certain circumstance. *See* 18 U.S.C. § 2517. But if a wire or oral communication was intercepted in violation of the statutory provisions, "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, ... or other authority of the United States." *Id.* § 2515. And "[a]ny aggrieved person in any trial, hearing, or proceeding ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter," on grounds including that "the communication was unlawfully intercepted." *Id.* § 2518(10)(a)(i). An "aggrieved person" means "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.* § 2510(11).

Congress addressed "litigation concerning sources of evidence" in the Organized Crime Control Act of 1970. Pub.L. No. 91–452, tit. VII, § 702(a), 84 Stat. 923, 935 (1970).

> In any trial, hearing, or other proceeding ... upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act....

18 U.S.C. § 3504(a)(1). Section 3504(b) establishes the link with Title III, defining "unlawful act" as "the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto." *Id.* § 3504(b). Further, a "party aggrieved" under § 3504(a)(1) includes an "aggrieved person," as defined in Title III, and any person

on whose premises the intercepted communications occurred. *See United States v. Williams,* 580 F.2d 578, 583 & n. 19 (D.C. Cir.1978).

■ Under these related provisions, a party claiming to be the victim of illegal electronic surveillance must first demonstrate that his interests were affected before the government's obligation to affirm or deny is triggered. This "standing" requirement, *see* H.Rep. No. 1549, 91st Cong., 2d Sess., ——, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4027, is met if a definite "claim" is made by an "aggrieved party." A cognizable "claim" need be no more than a "mere assertion," provided that it is a positive statement that illegal surveillance has taken place. *See United States v. Tucker,* 526 F.2d 279, 282 & n. 4 (5th Cir.1976). But the claimant must also make a prima facie showing that he was "aggrieved" by the surveillance; that is, that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises. This critical showing may not be based on mere suspicion; it must have at least a "colorable basis." *See United States v. Pacella,* 622 F.2d 640, 643 (2d Cir.1980).

Once a party makes such a showing, the government must "affirm or deny" the occurrence of the alleged unlawful act. 18 U.S.C. § 3504(a)(1). Litigation has focused on the adequacy of the government's denial. In construing the plain language of the statute that the government must "deny" the claimant's allegations, courts have focused on three factors: the specificity and amount of information that forms the basis of the government's denial, the source or sources for that information, and the manner in which the information is presented to the court. *See In Grand Jury 11–84,* 799 F.2d 1321, 1324 (9th Cir.1986).

First, the required specificity of the prosecution's denial is a function of the specificity of the claimant's allegations. *See United States v. Wylie,* 625 F.2d 1371, 1376 (9th Cir.1980). The government's general denial of a claimant's general allegations of illegal electronic surveillance is sufficient, *see, e.g., In re Grand Jury 11–84,* 799 F.2d at 1324; where the claimant makes a stronger showing, the government's denial must be factual, unambiguous, and unequivocal. *See Cruz v. Alexander,* 669 F.2d 872, 876 (2d Cir.1982), *clarified,* 708 F.2d 31 (2d Cir.1983); *United States v. See,* 505 F.2d 845, 856 (9th Cir.1974).

■ The government's denial of illegal electronic surveillance is usually based on inquiries to the relevant government agencies and requests for searches of agency files. The predicate for acceptance of the government's denial is that the government official making the denial have sufficient information upon which a reasonable response can be based.

> In general, we shall expect the Government's denial to be amplified to the point of showing that those responding were in a position, by firsthand knowledge or through inquiry, reasonably to ascertain whether or not relevant illegal activities took place....

*In re Quinn,* 525 F.2d 222, 225 (1st Cir. 1975). Again, courts measure the adequacy of the source or sources of information against the specificity of the claimant's allegations on a case-by-case basis. The government agencies closest to the investigation must be checked, *see In re Millow,* 529 F.2d 770, 774 (2d Cir.1976), and the government's denial should provide some basis for concluding that the agencies checked are those that reasonably might have been involved. *See United States v. Alter,* 482 F.2d 1016, 1027 (9th Cir.1973). Courts rightly have been reluctant to find the government's denial inadequate for failure to make inquiries of state or local agencies that conceivably could have engaged in the alleged illegal surveillance. *See In re Grand Jury Proceedings,* 664 F.2d 423, 428 & n. 11 (5th Cir. Unit B Nov. 1981) (per curiam) (rejecting argument that federal government must extend scope of inquiry to cooperating state agencies; reserving question where federal agency "exercised considerable dominion and control over a state agency's resources in pursuing a federal investigation"); *United States v.*

*Kember,* 648 F.2d 1354, 1370 (D.C.Cir.1980) ("nothing in [§ 3504(a)(1) ] that requires the Government to inquire into state or local electronic monitoring"); *In re Brogna,* 589 F.2d 24, 29 (1st Cir.1978) (government's denial adequate despite failure to check records of assisting state agencies; dicta that "in different circumstances the federal authorities might ... be required to inquire of a cooperating state agency").

Finally, the manner or form in which the government presents its denial may be critical. While courts have sometimes required the government's denial to be in the form of a sworn affidavit, unsworn letters detailing the scope of the government's inquiry usually have been accepted. *See United States v. Williams,* 580 F.2d at 585 n. 38. The statute does not require the government to deny the claimant's allegations through live witness testimony, but where such testimony is presented, it is accorded greater weight than affidavits or unsworn letters. *See, e.g., In re Grand Jury,* 524 F.2d 209, 216 (10th Cir.1975).

If the government affirms that illegal electronic surveillance of the claimant has taken place, the government must provide to the claimant the tapes or transcripts of the intercepted communications. *See Alderman v. United States,* 394 U.S. 165, 182–83, 89 S.Ct. 961, 971–72, 22 L.Ed.2d 176 (1969). Only the claimant's own conversations or those which took place on his premises must be disclosed and turned over by the government; the trial court has discretion to determine whether additional discovery should be granted. *Id.* at 185, 89 S.Ct. at 972; *United States v. Williams,* 580 F.2d at 583–85. The claimant then can challenge as tainted evidence obtained as a result of those specific intercepted communications. *See Alderman,* 394 U.S. at 176, 180–81, 89 S.Ct. at 968, 970–71; *United States v. Williams,* 580 F.2d at 584 n. 23. "The question as stated in *Wong Sun v. United States,* 371 U.S. 471, 488 [83 S.Ct. 407, 417, 9 L.Ed.2d 441] (1963), is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Alderman,* 394 U.S. at 180–81, 89 S.Ct. at 970; *see* 18 U.S.C. §§ 3504(a), 2515, 2518(10)(a)(i).

■ At the taint hearing, the claimant has the initial burden of coming forward with specific evidence demonstrating taint. *See Alderman,* 394 U.S. at 183, 89 S.Ct. at 972; *United States v. Buck,* 548 F.2d 871, 874 (9th Cir.1977). The government may then avoid a finding of taint, however, by demonstrating by a preponderance of the evidence that it acquired the evidence from an independent source. *See Alderman,* 394 U.S. at 183, 89 S.Ct. at 972; *United States v. Buck,* 548 F.2d at 874. The trial court's decision whether to order additional disclosure beyond the records of the communications involving the claimant is a discretionary ruling entitled to appropriate deference. *See United States v. Bissell,* 634 F.2d 1228, 1234 (9th Cir.1980); *see also Alderman,* 394 U.S. at 185, 89 S.Ct. at 972. And a determination that the government obtained evidence from an independent, untainted source is a factual one which must be upheld unless clearly erroneous. *See United States v. Garcilaso de la Vega,* 489 F.2d 761, 763 (2d Cir.1974); *see also United States v. Villano,* 529 F.2d 1046, 1058 (10th Cir.1976) (trial court's finding of independent source sustained where "amply supported" in the record).

### B

■ Stacy first challenges the district court's ruling that he lacks standing to raise the issue of the allegedly illegal surveillance. Stacy's claim that he was a "party aggrieved" under § 3504(a)(1) was based exclusively on the ground that he was a party to telephone conversations intercepted by the Virginia state authorities through the tap of Trevis Poole's telephone. He relied principally on the averment of his counsel that "he [Stacy] advised me that he to [sic] had telephoned the Poole's in Fluvanna County, Virginia, in either May, June or July 1985." In addition, he cited grand jury testimony that he spoke "regularly" on the telephone to Trevis Poole.

We agree with the district court that Stacy's showing was insufficient to demonstrate standing. In this case, unlike most of the others where a party raises the issue of alleged illegal surveillance, there has never been any question that Trevis Poole's phone was tapped. Yet Stacy never averred that he completed telephone calls to the number known to have been tapped during the period that surveillance took place. In *United States v. Williams*, 580 F.2d at 584, the court held that the defendants failed to carry the threshold burden of demonstrating that any of their conversations were intercepted when they failed to positively aver that they had completed calls to the tapped numbers. We think that in the similar circumstances here, Stacy's failure to aver that he was involved in telephone conversations on the tapped line is also fatal to his claim. The grand jury testimony Stacy cites amounts to no more than "mere suspicion" that he might have talked to Trevis Poole on the tapped phone during the relevant period, *see United States v. Pacella*, 622 F.2d at 643; it contains no specific reference to times or to the phone line that was tapped. Likewise, counsel's affidavit fails to identify whether any specific calls were completed to Trevis Poole's phone. Finally, though he emphasized that any "regular" communication from his home in Maryland with Trevis Poole in Virginia would have had to have been by phone, Stacy presented no phone company records to substantiate his claim. We hold that Stacy failed to make the necessary prima facie showing that he was a "party aggrieved" under § 3504(a)(1).

C

■ Sherrie, like Stacy, based her claim that she was an aggrieved party under 18 U.S.C. § 3504(a)(1) solely on the ground that she was a party to telephone conversations that were intercepted by Virginia au-

thorities. In contrast to Stacy, however, Sherrie presented in support of her motions her own affidavit, in which she specifically averred that she had a conversation with Patty Poole on Trevis Poole's phone during the period that his phone was tapped by Virginia authorities. Patty Poole also averred that she had a conversation with Sherrie on her brother-in-law's telephone during the relevant period. Though the district court's ruling is not entirely clear, we agree with the court's apparent ruling and hold that Sherrie made a sufficient prima facie showing that she was an aggrieved party under § 3504(a)(1).

■ Sherrie's prima facie showing triggered the government's obligation to affirm or deny the occurrence of the alleged unlawful interceptions. The government denied that it had intercepted any of Sherrie's conversations. In support of its position, the government offered an unsworn letter from the Department of Justice which indicated that records checks by six federal agencies [15] disclosed no evidence that the Apples had been electronically monitored by the respective agencies except for consensual monitoring by the FBI.[16] The district court accepted the letter as the government's "unequivocal denial" and refused to order additional disclosure. The court also credited the testimony of FBI Agent Patterson that the AUSA involved in the Virginia investigation had told Patterson that the AUSA was unaware of any interceptions of conversations involving the Apples.

We cannot agree that the government's denial was sufficient in light of Sherrie's specific claim that her conversations were intercepted during the Virginia state wiretap of Trevis Poole's telephone. Though in response to Sherrie's initial motion the government indicated that it was unaware

---

**15.** The six federal agencies were the FBI, the DEA, the Bureau of Alcohol, Tobacco, and Firearms, the Customs Service, the Postal Service, and the Secret Service.

**16.** Consensual interceptions of communications are not covered under Title III.

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c).

of any electronic intercepts, it later acknowledged the existence of the Virginia wiretap in its supplemental response to the motion and indicated that it was requesting the state agencies involved to conduct the necessary records inquiry. *See* J.A. at 80. Sherrie then filed additional motions that focused the inquiry on the Virginia wiretap, and the district court deferred ruling on the related electronic surveillance motions. There was no question that a state wiretap was involved, and in these circumstances a check of only federal agencies was not an adequate response to Sherrie's claim. *See In re Millow*, 529 F.2d at 774; *United States v. Alter*, 482 F.2d at 1027.

At the motions hearing, the government presented no evidence of any official inquiry of Virginia state authorities. Rather, the government presented the testimony of Agent Patterson and Officer Hammond. Though each testified that he was personally unaware of any intercepted conversations involving the Apples, their testimony showed that neither was involved in the investigation of the Apples until some time after the wiretap was removed. And, critically, no evidence was presented that either had reviewed the logs of the surveillance or listened to any of the tapes, the kind of first-hand inspection required in response to Sherrie's particularized claim. *See United States v. Gardner*, 611 F.2d 770, 774 (9th Cir.1980). Agent Patterson's hearsay testimony, deemed significant by the district court, is similarly deficient—his testimony provides no assurance that any of his sources were in a position reasonably to ascertain, by having checked the tapes or the logs, whether or not Sherrie's conversations had been intercepted. *See In re Grand Jury 11–84*, 799 F.2d at 1325; *In re Quinn*, 525 F.2d at 225.

In order to affirm the district court's ruling that the government's response was adequate we would be required to hold that a federal prosecutor is never required to check with state agencies when a claimant makes a prima facie showing under § 3504(a)(1) that she was subjected to illegal surveillance by state authorities, even where it is undisputed that the federal investigation was aided by the state authorities. No court, as far as we have been able to determine, has squarely faced this question. In some cases, where the government has admitted that the claimant's communications had been intercepted by state or local authorities, the surveillance records have been disclosed. *See, e.g., United States v. Villano*, 529 F.2d at 1056–58. In cases where courts have found the government's denial adequate despite the failure to check with state or local authorities, there was no clear evidence that there was a nonfederal wiretap. And those courts did not attempt to state a blanket rule that inquiry of state or local authorities would never be required. *See In re Grand Jury Proceedings*, 664 F.2d at 428 & n. 11; *In re Brogna*, 589 F.2d at 29.

Congress' intent, our ultimate guideline, is not plainly evident. The plain language of the statute requires the government only to "affirm or deny" the claim, and the legislative history sheds little additional light on what this implies. Courts have nevertheless uniformly held that to "deny" a claim under § 3504(a) the government must have some reasonable basis for asserting that the alleged illegal surveillance did not occur. Congress did contemplate some federal/state overlap in this area. Though § 3504(a) itself applies only in proceedings conducted under the authority of the United States, *see* H.Rep. No. 1549, 91st Cong., 2d Sess., ——, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4027, the "unlawful act" alleged under that section may be any use of electronic surveillance equipment in violation of the Constitution or federal law. *See* 18 U.S.C. § 3504(b). Sherrie claims that the Virginia wiretap violated 18 U.S.C. § 2518(1)(c) and Va.Code Ann. § 19.2–68(A)(3) (1990),[17] and

---

17. Sherrie argued that the Virginia wiretap was illegal because the authorities failed to first exhaust other investigative means before seeking the wiretap and because the affidavits submitted in support of the order authorizing the wiretap were conclusory and misleading. The relevant federal and state statutes provide in identical terms that the application for the court order authorizing the wiretap shall include "a full and complete statement as to whether or not other

federal law requires that a state-authorized wiretap conform to federal and applicable state law. *See* 18 U.S.C. § 2516(2) (state court judge of competent jurisdiction may issue order authorizing or approving interception of wire communications "in conformity with section 2518 ... and with the applicable State statute"). Sherrie has stated a claim under § 3504(a)(1) and made the requisite prima facie showing to trigger the government's obligation to respond; her claim may be reasonably denied under the statute only upon the government's showing that the Virginia wiretap was not illegal or that the state authorities did not intercept any of her communications.

## D

The district court also ruled, assuming that the Virginia wiretap was illegal, that Sherrie had standing to raise the issue, and that the government's denial was not adequate, that there was sufficient evidence from sources independent of the Virginia investigation "to support probable cause for the search of the Apples' [Maryland] residence and probable cause for other evidence presented to the grand jury and to be presented at the trial." J.A. at 364. On this alternative basis the court held that Sherrie's related motions could be denied, and the government contends that this court can affirm the denial on this independent source rationale. The court's independent source rationale is not inconsistent with the relevant statutes, but we think that its ruling in this case was premature. Sherrie had no meaningful opportunity to demonstrate the extent of the taint from any communications that might have been intercepted by Virginia authorities. Further proceedings are required before any independent source determination can be made.

The relevant statutes, 18 U.S.C. §§ 3504(a)(1), 2515, and 2518(10)(a), proscribe the use of illegally intercepted communications and the fruit of that poisonous tree. The contents of illegally intercepted wire communications and the "evidence derived therefrom" may not be received into evidence, *id.* § 2515, and may be suppressed, *id.* § 2518(10)(a); the government must affirm or deny the occurrence of alleged illegal interceptions upon a claim that evidence is inadmissible "because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act," *id.* § 3504(a)(1). Congress intended, however, that the statutory provisions would "largely reflect[ ] existing law," including limitations on the suppression remedy, as developed under fourth amendment jurisprudence.

[Section 2515] largely reflects existing law. It applies to suppress evidence directly (*Nardone v. United States*, 302 U.S. 379 [58 S.Ct. 275, 82 L.Ed. 314] (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States*, 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307] (1939)). There is, however, no intention to change the attenuation rule. *See Nardone v. United States*, 127 F.2d 521 (2d [Cir.]), cert. denied, 316 U.S. 698 [62 S.Ct. 1296, 86 L.Ed. 1767] (1942); *Wong Sun v. United States*, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963). Nor generally to press the scope of the suppression role beyond present search and seizure law. *See Walder v. United States*, 347 U.S. 62 [74 S.Ct. 354, 98 L.Ed. 503] (1954).

S.Rep. No. 1097, 90th Cong., 2d Sess., 96, *reprinted in* 1968 U.S.Code Cong. & Admin.News, 2112, 2185 (parallel citations omitted); *see* H.Rep. No. 1549, 91st Cong., 2d Sess., ——, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4027 ("Section 3504(a) establishes procedures for the disposition of claims based upon allegations that evidence is the primary product of an unlawful act or has been derived from the 'exploitation' of an unlawful act. *See Wong Sun v. United States*, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963).") (par-

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); Va.Code Ann.

§ 19.2–68(A)(3) (1990). As we have noted, the substance of Sherrie's claim has never been addressed.

allel citations omitted); *see also United States v. Giordano,* 416 U.S. 505, 558–59, 94 S.Ct. 1820, 1847–48, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part).

In this case, the district court applied the generally accepted rule that the inclusion of certain illegally obtained information in the application for a search warrant does not require suppression of the evidence seized under the warrant ("fruit of the poisonous tree") if, excluding the illegally obtained information, probable cause for the issuance of the warrant could still be found. *See, e.g., United States v. Whitehorn,* 813 F.2d 646, 649 (4th Cir.1987); *see also Giordano,* 416 U.S. at 555, 94 S.Ct. at 1845 (Powell, J., concurring in part and dissenting in part). The court acknowledged, without deciding, Sherrie's argument that sources identified in the application for the Maryland search warrant had been developed through the Virginia investigation. But the court found, crediting the testimony of Officer Hammond, that other, untainted information sufficiently established probable cause and ruled that the evidence seized from the Apples' residence would not be suppressed.

■ The court also determined that other evidence forecasted by the government derived from wholly independent sources. Evidence sufficiently attenuated from allegedly illegal surveillance may also be admissible, even if the government had first been put on notice that the Apples might be involved in criminal activity by the illegal surveillance. *See United States v. Friedland,* 441 F.2d 855, 859 (2d Cir.1971). While the basis for this ruling is not explicit, it seems that the court again credited the testimony of Officer Hammond and Agent Patterson.

■ We cannot, however, affirm the district court's rulings simply on the basis that the court can, in certain circumstances, make independent source and attenuation rulings that would permit admission of evidence derivative at some level from illegally intercepted conversations. The Court in *Alderman* specifically addressed the procedures to be followed in resolving the "ultimate issue" before the court—whether the evidence against the defendant "grew out of his illegally overheard conversations or conversations occurring on his premises." 394 U.S. at 180, 89 S.Ct. at 970. The fundamental teaching of *Alderman* is that the claimant must be provided with the records of his own illegally intercepted communications so that he has a reasonable opportunity to prove the extent of the taint. 394 U.S. at 182–85, 89 S.Ct. at 971–73. Section 3504(a)(1) facilitates the claimant's effort to demonstrate that evidence employable against him is tainted by requiring the government to affirm or deny the occurrence of the alleged unlawful act. *See United States v. Williams,* 580 F.2d at 583. The same logic that compelled the Court's conclusion that surveillance records must be disclosed to the claimant, not screened for relevance by the government, *see Kolod v. United States,* 390 U.S. 136, 137–38, 88 S.Ct. 752, 753, 19 L.Ed.2d 962 (1968) (per curiam), or by the trial court *in camera, see Alderman,* 394 U.S. at 182–84, 89 S.Ct. at 971–72, compels our conclusion in this case— our criminal justice system depends upon adversary proceedings with well-informed advocates as the principal means for attaining justice and reducing the incidence of error. "To compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, and then to withhold from him the means or tools to meet that burden, is to create an absurdity in the law." *United States v. Huss,* 482 F.2d 38, 47 (2d Cir.1973) (citation omitted). The district court's erroneous ruling respecting the government's denial under § 3504(a)(1) undermined the validity of its subsequent independent source rulings because it precluded Sherrie from demonstrating in informed adversary proceedings the extent of the taint from any of her conversations that might have been intercepted during the Virginia investigation.

Case law supports this disposition. The government cites in support of its position *United States v. Peterson,* 812 F.2d 486 (9th Cir.1987), and *United States v. Bissell,*

634 F.2d 1228 (9th Cir.1980). *Peterson* is inapposite; the court there held that Title III was not applicable in the extraterritorial context at issue. 812 F.2d at 492.[18] In *Bissell*, the government disclosed to the appellant the transcripts of her conversations that had been intercepted. 634 F.2d at 1230. The court was thus in a position to make its ruling that evidence employed against the appellant was untainted, and its decision to reject the appellant's request for wide-ranging disclosure was a permissible exercise of discretion. *See id.* at 1231–34. *United States v. Villano*, 529 F.2d 1046 (10th Cir.1976), also fits this pattern. In *Villano*, the government furnished the defendants with the transcripts of the conversations intercepted by local police. *Id.* at 1058. After an adversary hearing, the district court found that, despite some evidence of collaboration between the local and federal authorities, the government had carried its burden of showing that its evidence was untainted, and the court of appeals affirmed. *Id.* at 1057–58; *see also United States v. Buck*, 548 F.2d at 874–75 (independent source ruling affirmed; tapes and log summaries disclosed to defendants).[19]

We recognize that Sherrie has not proven, and may never prove, that any of her conversations were intercepted by the Virginia authorities. Nevertheless, we are constrained to hold on the facts of this case that Sherrie should be given a more meaningful opportunity to prove her case. There was a wiretap of Trevis Poole's phone; given the relationship between the Apples and Poole, it is reasonable to assume that Sherrie would have made calls to Trevis's phone, and she averred that she did; evidence from the Virginia investigation was passed along to the state and federal authorities investigating the Apples; and the government has offered no reliable proof that Sherrie's conversations were not intercepted during the Virginia investigation. The district court abused its discretion when it ruled on the independent source issue before the government had adequately denied the occurrence of the alleged illegal surveillance.

### E

The judgment in Sherrie's case must be vacated and remanded for further proceedings under 18 U.S.C. § 3504(a)(1). Upon remand, the government may make a factual, unambiguous, unequivocal showing that none of Sherrie's conversations were intercepted during the wiretap of Trevis Poole's telephone. *See United States v. Alter*, 482 F.2d at 1027.[20] If the government discovers that some of Sherrie's conversations were intercepted during the wiretap, the records of those conversations must be disclosed; the district court may then exercise its discretion to determine whether additional disclosure should be ordered. *See Alderman*, 394 U.S. at 184–85, 89 S.Ct. at 972–73. The district court will then be in a position to consider the independent source issue. Alternatively, the government may seek to demonstrate that the Virginia wiretap was not an "unlawful act" under § 3504. In the event that the government adequately denies the occurrence of the alleged unlawful act, or the district court finds that the government's evidence was developed from independent sources or was sufficiently attenuated from the illegal interceptions, the court may reinstate its judgment. Contrary findings will necessitate a new trial with the tainted evidence suppressed.

### III

Stacy challenges the sentence imposed by the district court under the United

---

**18.** The *Peterson* court's independent source ruling respecting certain illegal wiretaps at issue in that case is unexceptional under the law we have described above. *See* 812 F.2d at 489–90.

**19.** We are not confronted with the situation where the government is unable to provide tapes or transcripts of intercepted communications because the records have been destroyed.

*See United States v. Garcilaso de la Vega*, 489 F.2d at 763–65; *United States v. Huss*, 482 F.2d at 45–51.

**20.** We will not strictly require that the government's denial be in the form of a sworn affidavit. *See United States v. Williams*, 580 F.2d at 585 n. 38.

States Sentencing Guidelines. He argues that the district court erred in failing to recognize that it had discretion to depart on account of his serious illness, committed clear error in finding that he did not affirmatively accept responsibility for his crimes, and erroneously enhanced his base offense level for possession of a firearm during the commission of a drug offense. Sherrie also appeals the enhancement of her sentence for possession of a firearm during the commission of a drug offense. We consider these assignments of error in order.

### A

■ The district court analyzed Stacy's request for departure on account of his illness under § 5K2.0, p.s., of the Guidelines. Section 5K2.0 provides a general basis for departure from a Guidelines sentence where the court finds that " 'there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.' " U.S.S.G. § 5K2.0, p.s. (quoting 18 U.S.C. § 3553(b)). The determination whether to depart under § 5K2.0 and § 3553(b) presupposes a two-part inquiry: first, the court must determine whether an aggravating or mitigating factor was not "adequately taken into consideration" and whether, as a factual matter, the factor is present in the particular case; second, the court determines whether the factor is of sufficient magnitude to justify departure. *See United States v. Summers*, 893 F.2d 63, 66 (4th Cir.1990). Where the district court has departed, the court's determination whether a factor was adequately taken

into consideration is reviewable *de novo*, the factual determination whether the factor is present in a particular case is subject only to clearly erroneous review, and the step-two determination whether the factor found is of sufficient magnitude to justify departure is reviewed for abuse of discretion. *See id.* at 66–67. The court's refusal to depart, however, is not reviewable on appeal. *See United States v. Bayerle*, 898 F.2d 28, 30–31 (4th Cir.), *petition for cert. filed*, 59 U.S.L.W. 3016 (U.S. June 7, 1990) (No. 89–1934).

The district court's refusal to depart in this case on account of Stacy's illness is not reviewable on appeal. In an attempt to avoid this rule,[21] Stacy contends that the court's refusal to depart was based on its mistaken assumption that it lacked the authority to depart. *See Bayerle*, 898 F.2d at 31 (district court's erroneous belief that it lacked the authority to depart reviewable as sentence imposed "in violation of law" under 18 U.S.C. § 3742(a)(1)). The record, however, refutes this contention—the court carefully considered whether Stacy's illness justified departure under U.S.S.G. § 5K2.0 and found, based on "all the facts," that departure was not warranted. *See supra.*[22] We also note that the court did sentence Stacy near the bottom of the applicable Guidelines range. *See Summers*, 893 F.2d at 66 (factor may be of sufficient significance only to affect point within Guidelines range at which defendant is sentenced).

### B

■ The Sentencing Commission addressed adjustments in sentence to reflect

---

**21.** *Bayerle* had not yet been decided when the parties filed their briefs in this case. Both parties, however, noting decisions in other circuits, addressed the question whether a discretionary refusal to depart was reviewable on appeal.

**22.** The district court's determination that the facts in this case did not warrant departure, the second step in the *Summers* approach, *see* 893 F.2d at 66, obviates any need for us to determine whether the Sentencing Commission failed to take into consideration an offender's life-threatening illness in formulating the Guidelines. *Cf. United States v. Ghannam*, 899 F.2d

327, 329 (4th Cir.1990) ("Section 5H1.4 allows downward departures any time a sentencing court is presented with sufficient evidence of impairment."). Defense counsel admitted at oral argument before us that he did not press for departure under § 5H1.4 at Stacy's sentencing, which was held before *Ghannam* was decided. *See* J.A. at 779–83; *see also* Appellant's Brief at 13 n. 4 ("United States Sentencing Guidelines § 5H1.4, while possibly applicable, seems to be referring to actual physical conditions, such as handicaps or being on a respirator.").

acceptance of responsibility in Guideline § 3E1.1. Section 3E1.1 provides for a two level reduction in base offense level where "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). The reduction of offense level "recognizes legitimate societal interests"; "a defendant who clearly demonstrates a recognition and affirmative acceptance of personal responsibility for the offense by taking, *in a timely fashion,* one or more of the actions listed [in the commentary] (or some equivalent action) is appropriately given a lesser sentence than a defendant who has not demonstrated sincere remorse." *Id.* comment. (backg'd) (emphasis added). The commentary to Guidelines § 3E1.1 includes a nonexclusive list of factors that can be considered in making the determination whether the defendant has accepted responsibility, including "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." *Id.,* comment. (n. 1(g)). A defendant who enters a guilty plea is *not* entitled to a sentencing reduction as a matter of right, *id.* § 3E1.1(c); a guilty plea *may* provide some evidence of the defendant's acceptance of responsibility, but it does not by itself entitle a defendant to the two level reduction. *Id.,* comment. (n. 3). "The determination whether a defendant 'clearly demonstrates a recognition and affirmative acceptance of personal responsibility' is a factual issue, and the district court's decision not to reduce the offense level will not be disturbed unless clearly erroneous." *United States v. Harris,* 882 F.2d 902, 905 (4th Cir.1989).

 The district court's determination that Stacy did not clearly demonstrate affirmative acceptance of responsibility is not clearly erroneous. The court rightly noted that Stacy's guilty plea alone did not justify departure. The fact that he did not plead until after his wife was convicted and his own trial was fast approaching tends to show lack of affirmative acceptance of responsibility. *See United States v. White,* 875 F.2d 427, 432 (4th Cir.1989). Stacy's contention that the district court should not have taken into consideration his refusal to cooperate in determining his acceptance of responsibility is meritless. The fact that failure to cooperate is not enumerated in the Guidelines commentary as a factor that courts may consider does not imply that a court may not find that a defendant's failure to cooperate demonstrates lack of acceptance of responsibility in a particular case. *See* U.S.S.G. § 5K1.2, p.s., comment. (backg'd) (Nov. 1987) ("Refusal to assist authorities based upon continued involvement in criminal activities and association with accomplices may be considered ... in evaluating a defendant's sincerity in claiming acceptance of responsibility."); [23] *cf. id.* § 3E1.1, comment. (n. 1(e)) (voluntary assistance to authorities in recovery of fruits and instrumentalities of offense is appropriate consideration). Stacy also questions the district court's finding that his objections to the government's statement of facts indicate a failure to affirmatively accept responsibility for his crimes. Even accepting the premise of this argument, that a defendant should not be penalized for trying to correct errors he sincerely believes exist in the statement of facts that will accompany his plea agreement, we think that Stacy's unwillingness to "agree" to the amended statement of facts reflects a continuing reluctance to recognize and accept his criminal conduct. In any event, the court had a sufficient basis for finding that Stacy failed clearly to demonstrate affirmative acceptance of responsibility.

C

The district court enhanced Sherrie's base offense level two levels pursuant to

23. The background commentary noted in the text was part of the Guidelines when Stacy was sentenced. The Guidelines were amended, effective November 1, 1989, to "delete [this] unnecessary commentary containing an unclear example." U.S.S.G. App. C, at 150–51. We need not determine whether this amendment reflects an intent on the part of the Commission to foreclose consideration of a defendant's failure to cooperate in evaluating his acceptance of responsibility. *See* 18 U.S.C. § 3553(a)(4), (5) (Guidelines and policy statements in effect on date defendant is sentenced are considered by sentencing court).

U.S.S.G. § 2D1.1(b)(1) and enhanced Stacy's base offense level on similar reasoning at his subsequent sentencing hearing. Guidelines § 2D1.1, applicable to drug offenses, mandates that "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense, increase [base offense level] by 2 levels." U.S.S.G. § 2D1.1(b)(1). The commentary adds that the adjustment "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested in his residence, had an unloaded hunting rifle in the closet." *Id.*, comment. (n. 3). The determination whether a firearm was present in the sense that it justified enhancement is a factual determination subject to clearly erroneous review. *See United States v. Koonce*, 884 F.2d 349, 353 (8th Cir.1989).

The Montgomery County Police seized four handguns along with drugs, paraphernalia, and records when they executed their search of the Apples' Maryland residence on August 14, 1987. The government also showed at Sherrie's trial that drug sales transactions and conspiratorial meetings occurred at the Apples' New York apartment in the spring of 1988. A handgun was seized when the FBI searched the Apples' New York apartment on May 20, 1988. The court enhanced Sherrie's sentence based on the finding that she "was well-aware of the existence of firearms in her home." The court enhanced Stacy's sentence based on the finding that "[o]ne or more firearms were found, both in the Apples's [sic] New York City apartment and in their Montgomery County home."

 Sherrie contends that the § 2D1.1(b)(1) enhancement is inapplicable because she had left the New York apartment some time before the seizure and was not arrested there, because no drugs were seized there, and because there was no positive testimony that the gun was present during the illegal acts supporting her conviction. She argues that the Mary-

land guns were seized prior to the effective date of the Guidelines and therefore should not be considered by a court sentencing under the Guidelines.

Stacy contends that his record for purposes of sentencing should be strictly limited to the statement of facts appended to his plea agreement and that the statement of facts contains no mention of any criminal activity in the New York apartment. Therefore, he argues, he cannot be charged with possession of the New York gun during the commission of a drug offense. He also argues that the Maryland guns may not be considered because the court found, in the context of determining which of Stacy's prior convictions could be counted in establishing his Guidelines criminal history category,[24] that the conspiracy in count one, to which Stacy pled guilty, did not begin until the fall of 1987. *See* J.A. at 796–97. Since the guns were seized in August 1987, they could not have been possessed during the commission of the offense.

We think that both Sherrie and Stacy have raised substantial questions that the district court's stated reasons for imposing sentence enhancement under § 2D1.1(b)(1) did not address. Under the Sentencing Reform Act, "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of a particular sentence." 18 U.S.C. § 3553(c). "'Reasons' means something more than conclusions—a distinction important not only to the defendant whose future is at stake but also to the appellate process, for once the judge passes on contested issues of fact, and application of law to fact, our review is deferential." *United States v. White*, 888 F.2d 490, 495 (7th Cir.1989). Where substantial questions are raised respecting whether a defendant possessed a firearm during the commission of a drug offense within the meaning of the Guidelines, the sentencing court should explicitly state the reasons why enhancement under the Guidelines is appropriate. *See United States v.*

---

**24.** *See* U.S.S.G. § 4A1.1(a) & comment. (n. 1) (sentence imposed more than fifteen years prior to defendant's commencement of instant offense not counted).

*Durrive,* 902 F.2d 1221, 1231 n. 8 (7th Cir.1990).

The district court's statements of reasons in these cases were inadequate, and we find ourselves unable in consequence properly to review its sentencing dispositions. The commentary to § 2D1.1(b)(1) makes clear that the Commission did not intend that the mere fact that a weapon was found in the home of the defendant is necessarily sufficient for enhancement under that section. U.S.S.G. § 2D1.1(b)(1), comment. (n. 3). Yet the district court's "reason" for enhancing Stacy's sentence under § 2D1.1(b)(1) was simply that weapons were found in the Apples' residences. The court's reason for enhancing Sherrie's sentence was slightly more revealing—the court determined at least that Sherrie was "well-aware" of the existence of the guns in her "home."[25] Even that reason, however, is not inconsistent with a finding that it was "clearly improbable" that the weapons were connected with her offenses. *See id.*

Since the district court sentenced both Sherrie and Stacy without stating adequate reasons for enhancement under § 2D1.1(b)(1), we must remand both cases for further proceedings.[26] *See* 18 U.S.C. § 3742(f)(1). On remand, if the court determines that it is not "clearly improbable" that either or both appellants possessed a weapon during the commission of an offense and that enhancement under § 2D1.1(b)(1) is still appropriate, the court should first make clear whether it is enhancing their respective sentences based on the New York gun or the Maryland guns. If enhancement is based on the Maryland guns, the court should address in its § 3553(c) "reasons" the contention that the Maryland guns were seized prior to the commencement of the conspiracy for which either appellant was convicted and therefore cannot have been possessed "during

commission of the offense."[27] The mere fact that the weapons were seized prior to the effective date of the Guidelines would not preclude the court from considering them in sentencing if they were possessed during the commission of an offense. If enhancement is based on the New York gun, the court should address Sherrie's temporally-based contention that it was "clearly improbable" that she possessed the handgun found in the New York apartment during any drug transactions that occurred there some months before. Sherrie's contention that she had separated from Stacy and moved out of the New York apartment also presents the question of her withdrawal from the conspiracy. The fact that the New York gun was not mentioned in the statement of facts appended to Stacy's plea agreement would not prevent the court from considering it; the agreement itself indicates that the court was not bound by the stipulated facts and was free, with the aid of the presentence report and "any other relevant information," to determine the facts relevant to sentencing. J.A. at 908–09. The court must still state its reasons for finding that Stacy did possess that gun during the commission of an offense.

## IV

In case No. 89–5066, the judgment of conviction against Sherrie Apple is vacated and the case is remanded for further proceedings consistent with this opinion. In case No. 89–5423, the judgment of conviction against Stacy Apple is affirmed; we vacate the sentence imposed and remand for further sentencing proceedings.

SO ORDERED.

---

**25.** We are not able to determine from the record whether the district court was specifically referring to either the Maryland home or the New York apartment, or both.

**26.** The district court's imposition of sentence in Sherrie's case is contingent upon the court's determination, after consideration of the illegal

surveillance issue as outlined *supra,* that a new trial is not warranted.

**27.** This argument was raised by Stacy, but would seem applicable to both appellants. Both were convicted of the same conspiracy counts.