PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: GRAND JURY SUBPOENA
(T-112)

---

UNITED STATES OF AMERICA,

*Petitioner-Appellee,*

v.

UNDER SEAL #10,

*Movant-Appellant.*

---

UNDER SEAL #1; UNDER SEAL #2;
UNDER SEAL #3; UNDER SEAL #4;
UNDER SEAL #5; UNDER SEAL #6;
UNDER SEAL #7; UNDER SEAL #8;
UNDER SEAL #9; UNDER SEAL #11;
UNDER SEAL #12; UNDER SEAL 13;
UNDER SEAL #14; UNDER SEAL
#15;, UNDER SEAL #16; UNDER
SEAL #17, UNDER SEAL #18; UNDER
SEAL #19; UNDER SEAL #20; UNDER
SEAL #21; UNDER SEAL #22; UNDER
SEAL #23; UNDER SEAL #24; UNDER
SEAL #25; UNDER SEAL #26; UNDER
SEAL #27; UNDER SEAL #28; UNDER
SEAL #29; UNDER SEAL #30; UNDER
SEAL #31; UNDER SEAL #32; UNDER
SEAL #33; UNDER SEAL #34,

*Movants.*

No. 06-2125

In Re: GRAND JURY SUBPOENA
(T-112)

UNITED STATES OF AMERICA,

      *Petitioner-Appellee,*

      v.

UNDER SEAL #1-#11,

      *Movants-Appellants.*

No. 06-2220

In Re: GRAND JURY SUBPOENA
(T-112)

UNITED STATES OF AMERICA,

      *Petitioner-Appellee,*

      v.

UNDER SEAL #1; UNDER SEAL #2;
UNDER SEAL #3; UNDER SEAL #4;
UNDER SEAL #5; UNDER SEAL #6;
UNDER SEAL #7; UNDER SEAL #8;
UNDER SEAL #9; UNDER SEAL #10;
UNDER SEAL #11,

      *Movants-Appellants.*

UNDER SEAL #13,

      *Movant.*

No. 06-2313

In Re: GRAND JURY SUBPOENA
(T-112)

UNITED STATES OF AMERICA,

        *Petitioner-Appellee,*

        v.

UNDER SEAL #1,

        *Movant-Appellant.*

No. 07-1646

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:06-mc-00001; 1:06-mc-00002)

Argued: September 23, 2009

Decided: February 24, 2010

Before TRAXLER, Chief Judge,
WILKINSON, Circuit Judge, and
Margaret B. SEYMOUR, United States District Judge
for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Seymour joined. Chief Judge Traxler wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: Steven Karl Barentzen, THE LAW OFFICE OF STEVEN BARENTZEN, Washington, D.C.; Nancy Anne

Luque, LUQUE GERAGOS MARINO, LLP, Washington, D.C., for Appellants. Gordon D. Kromberg, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Mitka T. Baker, DLA PIPER US LLP, Washington, D.C., for Appellants. Chuck Rosenberg, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

The twelve interrelated corporations in this case refused to turn over documents demanded by grand jury subpoenas duces tecum and now appeal a district court decision holding them in civil contempt.[1] One of the corporations, known as Appellant #10, alleges that it was the subject of unlawful National Security Agency wiretapping. It thus claims it had just cause to refuse to comply with its subpoena on the basis of purported constitutional violations as well as alleged violations of the Foreign Intelligence Surveillance Act of 1978 (FISA) and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which govern foreign and domestic surveillance, respectively. The other eleven corporations claim the district court abused its discretion by holding them in civil contempt because its orders to comply with the subpoenas were ambiguous.

For the reasons that follow, we hold that a grand jury enforcement action is not the appropriate place to litigate the validity of Appellant #10's surveillance claims. Additionally, the district court, which was in the best position to interpret its orders and the refusals of the other eleven appellants to comply with them, did not abuse its discretion by holding

---

[1]Because this appeal involves grand jury deliberations, we do not refer to the twelve appellants by name.

them in civil contempt. We thus affirm the assessments imposed on the various appellants.

I.

Appellants are a group of twelve interrelated for-profit and not-for-profit corporations suspected of participating in the financing of terrorist activity. In March 2002, search warrants were executed at the offices shared by appellants and other related corporations as well as at the homes of several of the corporations' principals. Many documents were seized before being returned approximately eighteen months later in some two hundred boxes. The documents were then placed in a storage unit by appellants' shared counsel, Nancy Luque, and maintained by her in the condition in which they were received. Appellants never had actual possession of the documents after March 2002.

Subsequently, in early 2006, an unrelated grand jury issued subpoenas duces tecum to each of the appellants through their common counsel, Ms. Luque. The subpoenas were broadranging and covered all aspects of the entities' operations. For instance, the subpoena to Appellant #10 demanded "all corporate records and books of account" since 2000 and also demanded any and all documents from any time period in fifteen separate categories dealing with a wide variety of financial transfers, overseas affiliates, and personnel decisions.

Among other things, the subpoenas requested evidence in appellants' constructive possession, which was defined to include documents in the possession of appellants' agents or attorneys. Appellants admit that many of the documents returned following the 2002 investigation were sought by the 2006 grand jury subpoenas. Br. of Appellants at 9. The various subpoenas initially demanded production by February 23 or 28, 2006, but no production was forthcoming on those dates.

Following preliminary discussions between appellants and the United States, attorney Luque indicated on March 16 that no production would be forthcoming unless the government affirmed or denied whether any of the appellant corporations were subject to electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 (Title III), the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. §§ 1801 *et seq.*, or the National Security Agency's (NSA's) then-recently disclosed electronic surveillance program. Following 18 U.S.C. § 3504(a)(1), the United States promptly wrote the corporations, stating that they "were not and are not a subject of electronic surveillance pursuant to Title III" but denying that appellants were entitled to notification of any other surveillance.

After appellants produced no documents through the end of March 2006, the district court entered show cause orders for all twelve entities to explain why they should not be held in contempt. A show cause hearing occurred on May 2, 2006. At the hearing, appellants argued that a contempt finding would be premature because the grand jury subpoenas were not themselves court orders. In response, the district court refrained from holding appellants in contempt, instead making the following statement on the record:

> And likewise with the entities represented by Ms. Luque, I'm ordering them to compel—to comply with the subpoena that's been served on them. I'm ordering them to appear before the grand jury at the next date[,] and I'm ordering them to produce the documents called for by the subpoena.

Nor was this the only time at the May 2 hearing that the district court commanded full compliance with the subpoenas. After ascertaining that the grand jury would be sitting two days later, the district court stated, "I'm going to order them [appellants] to appear May 4th. . . . [T]hey're ordered to

appear before the grand jury and to produce documents." Finally, at the close of the hearing, the district court made one last, explicit statement, noting that "Ms. Luque's client is being given an *unambiguous, clear order to comply*." (emphasis added). Assuming that appellants were likely to file motions to quash the subpoenas, the court also set a schedule for briefing with a hearing to be held on June 8.

In spite of these orders, appellants provided only a limited number of documents on May 4 and asked for an extension until May 12. The district court denied the motion on May 5 in a written order that stated "Production must proceed *forthwith* and must be complete as counsel can make it no later than May 12, 2006." (emphasis in original).

On May 17, eleven of the twelve appellants produced responsive documents. They did not, however, produce any of the documents seized in 2002 and maintained by their attorney. Additionally, the last appellant, Appellant #10, did not produce any responsive documents at all, electing instead to challenge the legality of the alleged government wiretaps.

On June 7, one day before the next scheduled hearing, Appellant #10 moved for a finding that it was not in civil contempt. The corporation argued that it had just cause for its refusal to comply with the subpoena based on the allegation that it was subject to illegal electronic surveillance. The basis for this argument was an assertion by Appellant #10's lawyer that the corporation and its principals were suspected of terrorist financing and had offices all over the world, thus making them likely targets of electronic surveillance. Additionally, Appellant #10's lawyer asserted that she and her clients "heard strange noises, including clicking sounds" while talking on the telephone.

The other eleven appellants took a different route at the hearing the next day, arguing they could not be held in contempt unless the government renewed its show cause motion.

While the district court was far from convinced, out of an abundance of caution it postponed any decision so the government could renew its motion with regard to all twelve corporations. Yet another hearing was scheduled for June 28, 2006.

At that hearing, attorney Luque argued that the eleven appellants were not in contempt because by this time they had produced all documents in their actual physical control. Under questioning from the district court, however, she admitted that appellants still had not handed over any of the documents she had maintained for them in the storage facility since 2003. She further admitted that she had instructed her paralegal not to search the storage facility documents in response to the grand jury subpoenas.

Appellants now also argue that the district court's May 2 and 5 orders were ambiguous. Because the May 5 written order stated that production must proceed "forthwith" and be "complete as counsel can make it no later than May 12, 2006," they claim that it was not clear what the district court had required and thus that appellants could not be held in contempt.

Additionally at the June 28, 2006 hearing, Luque stipulated that Appellant #10 had not produced all the records required. This stipulation was intended to precipitate a determination of the legality of the subpoena and whether the corporation had just cause for its refusal to comply. Following the June 28 hearing, no documents were produced by any of the appellants before October 2, 2006. At that time, the district court issued an order finding both Appellant #10 and the remaining eleven appellants in contempt for consistent failure to comply with the May 2, 2006 order (as amended May 5, 2006). In addition to this finding, the court rejected Appellant #10's just cause argument, holding that 18 U.S.C. § 3504's affirm or deny protections were limited to Title III surveillance at the grand jury stage. The district court also addressed Appellant #10's argument that the National Security Agency's surveil-

lance program was illegal, ultimately declining to decide the question because appellants lacked standing to challenge the NSA program prior to complying with the grand jury subpoena.

The district court imposed an immediate assessment of $3,000 against all twelve appellants collectively, with additional amounts of $3,000 per day to accrue until appellants complied with the subpoenas. The district court later denied a motion to reconsider but adjusted the accrual date to begin on October 5, 2006, one day after the appellants received actual notice of the contempt order. On October 19, 2006, the eleven appellants turned over more than 10,000 pages of responsive documents from the storage facility.

In light of this fact, the district court on November 6 found that the eleven appellants had complied with the subpoenas and purged their contempt. The court ordered them to pay $48,000 for sixteen days of contempt (later reduced to $39,000 for thirteen days based on the October 5 start date).

Also on November 6, the district court found that Appellant #10 remained in contempt. It therefore modified Appellant #10's civil contempt citation to $1,000 per day, starting at the date of the October contempt order. Appellant #10 provided all responsive documents the same day and ultimately was assessed an $18,000 fee. Subsequent to these events, on June 20, 2007, the district court held that Appellant #10 had purged itself of contempt but still was liable for the contempt amount. All twelve corporations now appeal their assessments to this court.

II.

A.

We must first address several preliminary questions before taking up the issue on the merits. As an initial matter, we

reject the assertion of all twelve appellants in Appeals No. 06-2313 and 07-1646 that the contempt fees assessed by the district court were criminal fines and thus impermissible unless imposed with appropriate procedural safeguards. Appellants argue that the district court imposed the fees as punishment for past recalcitrance rather than in a forward-looking attempt to induce compliance.

This argument simply does not comport with the facts. The district court's October 2, 2006 order, as amended, indicated that contempt fees were to begin on October 5, 2006, one day after appellants received actual notice that they were in contempt. This fact indicates that the contempt order was prospective, rather than punitive, in nature. Appellants had time to avoid the imposition of any fees and have only themselves to blame for their decision not to do so. As the Supreme Court has noted, a contempt assessment "is . . . remedial [and thus civil] when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order." *See Hicks v. Feiock*, 485 U.S. 624, 632 (1988). That describes the case before us here.

Appellants' argument that they should have received at least a week to comply with the order before fees began to accrue is nothing more than an invitation for us to second guess the district court's discretion, which we decline to do. Especially in light of the fact that appellants had been served with their respective subpoenas over eight months earlier, there was no abuse of discretion in the district court's contempt order.

## B.

At the invitation of the court, the parties have tendered submissions on the question of mootness. Although all twelve appellants have now purged their contempt by complying with their subpoenas, the appeal has not thereby been rendered moot. Unlike an individual confined for contempt,

whose lost time cannot be returned by judicial review of the underlying order, the monetary fees imposed on appellants suggest an obvious remedy. The eleven corporations still face an outstanding assessment of $39,000, and Appellant #10 still faces an outstanding assessment of $18,000. In the event this court affirms, the assessments will stand; in the event this court reverses, the assessments will be lifted.

In this situation, we find the Ninth Circuit's reasoning in *Shuffler v. Heritage Bank* persuasive. *See* 720 F.2d 1141 (9th Cir. 1983). There, as here, a civil contempt order was at issue. The district court ordered the owners of property in foreclosure to pay their debt or lose their land at auction. *Id.* at 1143. The owners did not make the ordered payments, instead engaging in a wide-ranging series of delaying tactics, and were eventually held in contempt and ordered to pay $500 per day until they complied. *Id.* at 1143-44. Several months later, the owners finally paid the debt owed the bank (plus interest) but were still ordered to pay $37,000 for the seventy-four days the district court determined they were in contempt. *Id.* at 1144-45. The Ninth Circuit explicitly recognized that "the contempt itself ha[d] been purged" but held that fact did not moot the assessments because the dispute about their propriety and amount remained a live controversy. *Id.* at 1145. It upheld the district court's finding of contempt and remanded the amount of the assessment to be recalculated in light of other issues not relevant here. *Id.* at 1146, 1149. The dispute is thus an extant one, and we cannot hold that mootness absolves us of the duty to decide it.

## III.

We thus consider the merits. We review the district court's findings that Appellant #10 and the other eleven appellants were in contempt for abuse of discretion. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000). Because the findings in this case are largely based on the district court's interpretation of its own May 2 and 5, 2006 orders, we give its reading

of those orders especial respect. *See JTH Tax, Inc. v. H&R Block Eastern Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) ("When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders."). Insofar as the district court's determination was based upon interpretations of law, however, we review those conclusions de novo. *Christian Science Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

IV.

Turning to Appeal No. 06-2125, Appellant #10 raises three arguments that it says justify the refusal to comply with its subpoena. First, it asserts that any wiretap that occurred is unconstitutional under the Fourth Amendment. Second, Appellant #10 asserts that the Foreign Intelligence Surveillance Act of 1978 (FISA) was violated in this case. The final claim is that 18 U.S.C. § 3504 was violated because the government's statement that it conducted no surveillance "pursuant to" Title III does not satisfy Section 3504's requirement that the government "affirm or deny" whether surveillance occurred.

At the same time, relying upon our decision in *United States v. Apple*, 915 F.2d 899 (4th Cir. 1990), the government argues that the district court incorrectly held Appellant #10 to be an "aggrieved party" under Section 3504(a). We need not address this question. For even if we assume that Appellant #10 is aggrieved, the district court did not abuse its discretion by holding the corporation in contempt for reasons set forth below.

A.

We shall address Appellant #10's three claims in turn. We first address the assertion that the alleged government surveil-

lance is unconstitutional under the Fourth Amendment. Appellant #10 argues that "[t]he NSA program's eavesdropping without a warrant violates the Fourth Amendment because any warrantless search is presumptively unreasonable." Br. of Appellants at 37. The appellant believes the subpoena and its itemized request, as well as those to whom it is directed, are tainted fruit of the unlawful surveillance. *See* Br. of Appellants at 10 (grand jury "subpoena sought certain specific documents and records giving rise to [Appellant #10's] belief it had been the subject of illegal surveillance.").

Regardless of whether Appellant #10 is correct in its assessment, the constitutional argument is not properly before us. The Supreme Court has made clear that grand juries are not the correct forum for litigating such claims. Indeed, the grand jury has long been empowered to consider a wide range of information from a variety of sources, whether or not it would be admissible at trial. *See*, *U.S. v. Calandra*, 414 U.S. 338, 344-45 (1974). As the Supreme Court has stated, "neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act." *Costello v. U.S.*, 350 U.S. 359, 362 (1956). The reason for this rule is the grand jury's function, not in ascertaining guilt, but in determining whether a crime may have occurred. *Calandra*, 414 U.S. at 344. Virtually any source that may be helpful to the investigation can be considered. For example, the Court in *United States v. Calandra* noted that "tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors" may trigger a grand jury investigation. *Id.* at 344 (citing *Branzenburg v. Hayes*, 408 U.S. 665, 701 (1972)).

Further, courts for generations have recognized that a grand jury indictment need not be based on evidence conforming to the formal requirements of a trial. As Justice Samuel Nelson, riding circuit in the 1850's, explained:

> No case has been cited, nor have we been able to find any, furnishing an authority for looking into and

revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof, or whether there was a deficiency in respect to any part of the complaint.

*U.S. v. Reed*, 27 F. Cas. 727, 738 (C.C.N.D.N.Y. 1852) (cited in *U.S. v. Williams*, 504 U.S. 36, 54 (1992)). *See also Blair v. U.S.*, 250 U.S. 273, 282 (1919) (same). As this circuit explained only recently, "a facially valid indictment is not subject to dismissal simply because the grand jury may have considered improper evidence, or because it was presented with information or evidence that may contravene a constitutional privilege." *U.S. v. Jefferson*, 546 F.3d 300, 312 (2008). *See also Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 261 (1988) ("the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment").

Because of this rule, courts have upheld grand juries' use of a broad range of evidence that would be inadmissible at trial. For instance, the *Calandra* Court allowed consideration of unlawfully seized evidence and refused to apply the Fourth Amendment's exclusionary rule at the grand jury stage. *Calandra*, 414 U.S. at 341-42. In doing so, the Court relied on *Costello v. United States*, in which the Supreme Court upheld a tax evasion conviction when the grand jury considered *only* hearsay evidence in returning an indictment. 350 U.S. at 361. Other decisions have reached similar results. Our decision in *United States v. Jefferson* rejected an invitation to engage in a comprehensive review of grand jury proceedings alleged to infringe on a congressman's constitutional Speech or Debate Clause rights. 546 F.3d at 312-14. *See also U.S. v. Johnson*, 419 F.2d 56 (4th Cir. 1969) (refusing to review grand jury proceedings to determine whether privileged legislative materials were considered). It is thus well-established that grand juries may consider broad-ranging sources of evidence, admissible at trial or not, as part of their mandate to uncover criminal acts.

Additionally, *Calandra* noted that limiting the evidence available to grand juries provides little additional protection to individual rights. As the Court explained, "[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim. . . . the rule's prime purpose is to deter future unlawful police conduct." *Calandra*, 414 U.S. at 347. Because potential inadmissibility at trial already provides a compelling incentive for investigators to respect Fourth Amendment strictures, *Calandra* saw no reason to extend the rule:

> Any incremental deterrent effect which might be achieved by extending the rule to grand jury pro-ceedings is uncertain at best. . . . The incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution.

*Id.* at 351. While there may be other objections that appellant may interpose as to the subpoena, a Fourth Amendment claim is not among them. Thus, regardless of whether or not the appellants in the current case were subjected to unlawful sur-veillance, as a preliminary matter there is no constitutional bar to a grand jury considering the subpoenaed documents. If there is no constitutional bar to the consideration of such evi-dence, there can be no constitutional challenge to its produc-tion. Appellant's belief that the subpoena is the fruit of the surveillance necessarily rests upon the very constitutional claim that, if litigated, the Supreme Court and this court have held would undermine the grand jury's investigative function.

### B.

Appellant #10 further insists that the government violated FISA itself, arguing that "FISA now governs all foreign intel-ligence surveillance conducted by the government and . . . the

NSA program does not comply with FISA." Br. of Appellants at 42. If appellant is correct, FISA directs courts to "suppress the evidence which was unlawfully obtained *or derived* from electronic surveillance of the aggrieved person," 50 U.S.C. § 1806(g) (emphasis added). Because Appellant #10 believes its subpoena is derived from unlawful surveillance, *see* Br. of Appellants at 10, it claims it was justified in disregarding the subpoena. For its part, the government asserts that litigating the validity of NSA surveillance at any stage "would require disclosure of state secrets, at great cost to the national security of the United States" and in violation of the Executive's inherent power. Br. of Gov't at 18. But both arguments speak more broadly than necessary, because the language of FISA simply precludes litigants from using that legislation to challenge surveillance at the grand jury stage.

FISA contains both a notice clause as well as an exclusionary procedure for illegally seized electronic surveillance. *See* 50 U.S.C. § 1806(c) and (e). The notice clause requires the government to notify the subject of a wiretap before the government introduces "any information obtained or derived from an electronic surveillance." 50 U.S.C. § 1806(c). Similarly, FISA's exclusionary procedure allows a party aggrieved by allegedly unlawful "evidence obtained or derived from an electronic surveillance" to "move to suppress the evidence." 50 U.S.C. § 1806(e).

The list of legal proceedings at which those FISA sections apply is phrased very similarly to the domestic surveillance regulations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, but with one significant exception: FISA omits any reference to grand juries and legislative committees, while they are included in Title III. Thus FISA allows motions to suppress illegal wiretaps or the fruits thereof "before any court, department, officer, agency, regulatory body, or other authority," 50 U.S.C. § 1806(e), and FISA's notice provision contains an identically worded clause. *See* 50 U.S.C. § 1806(c). In striking contrast, Section 2515 of Title

III prohibits use of illegal wiretaps "before any court, *grand jury*, department, officer, agency, regulatory body, *legislative committee*, or other authority." 18 U.S.C. § 2515 (emphasis added). Grand juries are similarly included in Section 3504(a)'s notice requirement. *See* 18 U.S.C. § 3504(a) (requiring the government to affirm or deny the existence of unlawful surveillance "[i]n any . . . proceeding in or before any . . . grand jury"). The omission of grand juries from FISA's exclusionary and notice mandates is too pointed to be inadvertent, and too clear a recognition that, at least in the most critical area of foreign and national security surveillance, Congress did not seek to displace the historic grand jury investigatory norms that *Calandra* and *Costello* recognized.

The specifics of 50 U.S.C. § 1806(c) and (e) must be given their due weight. Congress plainly wished to provide some limits on litigating foreign intelligence matters. The telling absence of grand juries from Section 1806(c) allows the government to introduce FISA evidence at the grand jury stage without triggering notice procedures. Since the exclusion provisions of Section 1806(e) also pointedly omit reference to grand juries, and since the government can introduce and use evidence under Section 1806(c) at the grand jury stage without providing notice, we are powerless to allow FISA surveillance challenges in fora where Congress has declined to do so. There may be other places to litigate FISA surveillance, but Congress has made plain that grand juries are not among them. In sum, we must give proper weight to the different ways Congress drafted the notice and exclusionary provisions of Title III and FISA, provisions that are parallel *except* for the stark omission of grand juries in the latter statute.

Nor is this result surprising. Congress has long recognized that a separate set of guidelines and rules are needed in the foreign intelligence context. For example, Title III as originally enacted disclaimed any application to the foreign surveillance sphere, noting that "[n]othing contained in this

chapter . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation . . ., to obtain foreign intelligence information . . ., or to protect national security information against foreign intelligence activities." 18 U.S.C. § 2511(3), Pub. L. 90-351, Title III, § 802, 82 Stat. 197, 214, *repealed by* Foreign Intelligence Surveillance Act of 1978, Pub. L. 95-511, § 201(c), 92 Stat. 1783.

While this language was subsequently removed to accommodate FISA, the change was not the result of congressional rethinking of foreign surveillance's distinctive status but rather because of FISA's comprehensive treatment of the subject. The law was enacted as "An Act to authorize electronic surveillance to obtain foreign intelligence information," Pub. L. 95-511, 92 Stat. 1783. The statute, as its name indicates, regulates foreign intelligence surveillance, and it covers every aspect of the same, addressing such topics as agents of foreign powers, 50 U.S.C. § 1801(b), international terrorism, 50 U.S.C. § 1801(c), sabotage, 50 U.S.C. § 1801(d), and proliferation of weapons of mass destruction, 50 U.S.C. § 1801(a)(7), (p). The Act was "designed to permit the Government to gather necessary foreign intelligence information by means of electronic surveillance but under limitations and according to procedural guidelines which will better safeguard the rights of individuals." S. Rep. No. 95-604(I), p.9 (1978). Congress obviously desired in foreign intelligence to "[s]trik[e] a sound balance between the need for such surveillance and the protection of civil liberties." *Id.* In light of the fact that Congress intended FISA to strike this balance, it is significant that grand juries were omitted from the legislation.

It is imperative that we not fashion a departure from congressionally enacted norms without some clear expression of congressional intent. Here there is not only no clear expression of congressional intent, but the statute governing foreign and intelligence surveillance indicates Congress intended its exclusionary mandate to stop short of grand jury proceedings.

To fashion notice and exclusionary requirements of our own in the grand jury context would place us well out in front of Congress and the Executive in a sensitive area in which the Constitution does, after all, assign to the elective branches of our government substantial powers. While Congress could certainly expand FISA in the manner that appellant seeks, it has not done so. That choice is for a coordinate branch of our government to make.

Our circuit law is wholly consistent with this view. In a decision upholding contempt awards against grand jury witnesses who argued (among other things) that they were entitled to notice of FISA wiretaps before testifying, we noted: "Neither the statutory language [of FISA] nor the legislative history requires notification prior to *grand jury* questioning. Congress certainly knew how to include grand jury investigations as proceedings before which notice must be given to overheard persons because it said so in the [Title III] domestic wiretap context." *In re Grand Jury Proceedings*, 856 F.2d 685, 690 (4th Cir. 1988) (emphasis in original). The logic of the decision is illuminating for two reasons. First, it again highlights the significant omission of grand juries from FISA's Sections 1806(c) and (e). Second, its emphasis on Congress's decision not to require notice prior to grand jury questioning in the foreign intelligence sphere cautions against circumventing that congressional judgment with a contrary judgment of our own.

## C.

Appellant #10's remaining claim is that the government did not satisfy 18 U.S.C. § 3504(a)(1) because it did not properly "affirm or deny the occurrence" of any violations of Title III's domestic wiretap provisions.[2] In response to a demand under

---

[2]The full text of 18 U.S.C. § 3504(a)(1) states that:

[U]pon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act.

Section 3504(a), the government wrote on March 27, 2006 that the subpoenaed corporations—including Appellant #10—"were not and are not a subject of electronic surveillance pursuant to Title III." Appellant #10 now asserts that this language only denied "the use of any *legal* surveillance pursuant to Title III" and did not "admit or deny whether [Appellant #10] was the subject of *illegal* electronic surveillance." Br. of Appellants at 38 (emphasis in original). Again the argument is that the government's admission of illegal surveillance would have indicated that the subpoena was tainted, establishing just cause under 28 U.S.C. § 1826 to refuse to comply with it. *See* Br. of Appellants at 23. Because we believe that the letter satisfied the government's obligation to affirm or deny Title III surveillance, we must reject Appellant #10's final argument.

As noted, the letter's actual language informed the subpoenaed corporations that they "were not and are not a subject of electronic surveillance pursuant to Title III." That language indicates that no Title III surveillance, lawful, unlawful, or any other kind, took place. The tone of the letter is not equivocal, but emphatic. The letter employs the negative "not" twice to state a denial that Title III surveillance of Appellant #10 occurred. It constitutes a denial under the statute, because there can be no unlawful surveillance under Title III if no Title III surveillance at all occurred. The district court thought this as well, stating that the government's letter satisfied Section 3504(a), holding that "[t]he government has met the Title III obligation to affirm or deny the use of illegal electronic surveillance." Were the letter something other than the plain denial it plainly appears to be, the government would have proceeded in nothing less than bad faith.

We do not find dispositive appellant's proffered distinction between "pursuant to" and "in violation of" Title III—a distinction that presupposes a deliberate sleight of the drafting hand. While lawyers, to be sure, can be very crafty in how they put things, we judges too can squint so hard at language

that the plain becomes ambiguous. Indeed, the government's letter responded to a similarly-worded demand from counsel for Appellant #10, who requested that the government "advise me whether any of my clients were, or still are, the subject of electronic surveillance *under* the Title III." (emphasis added). The difference between "under" and "pursuant to" escapes us, and the government's use of a response stating that no surveillance occurred "pursuant to" Title III can thus not be claimed an attempt at evasion. The point of the government's letter was to indicate in a comprehensive manner that Title III was not the basis of any surveillance. We may not parse the letter to the point that we strip it of plain meaning and divest it of plain import.

In most cases where surveillance is at issue, there are no foreign ties, and the government would simply affirm that surveillance was undertaken "pursuant to" Title III. Here, by contrast, there was a denial, and it does not seem surprising in a case with suspected foreign connections that the government would not proceed under Title III.

The question remains whether Appellant #10 can litigate the denial. The denial forfeits the government's future right to rely on Title III for the remainder of the proceeding, including in those cases where the evidence turns out not to be admissible under other sources of surveillance power. The statute's lack of any procedure for litigating a denial on the spot, however, indicates that Congress did not provide an avenue for such a contest. Rather, the proper remedy is exclusion under Title III or FISA, a remedy which is triggered when the government seeks to introduce evidence into a covered proceeding. *See* 18 U.S.C. § 2515; 50 U.S.C. § 1806(e). Congress of course could have provided a mechanism for litigation of the denial, perhaps similar to the provisions of the Classified Information Procedures Act, 18 U.S.C., App. 3 §§ 5, 6, which allows courts to resolve questions about the use and admissibility of classified materials in preliminary hearings before criminal trials. However, Congress did not make a compara-

ble decision here. For better or worse, Section 3504 provides some presumption of regularity to a denial where the government is not relying on Title III authorization for the introduction of evidence. In sum, we agree with the district court that the government thus satisfied Section 3504 by denying that any Title III surveillance took place.

### D.

In conclusion, while the parties ask us to rule broadly, we think it prudent to proceed in a more narrow fashion. We can sum up the issues straightforwardly. Appellant #10 argues that any surveillance was unconstitutional, disregarded FISA, and violated Section 3504. We have canvassed appellant's various claims but conclude that, whatever may or may not be their eventual merit, they simply are not properly litigated at this preliminary stage. *Calandra* and *Costello* indicate that whatever the constraints on admissibility at trial, there is no constitutional infirmity to the introduction of this evidence at the grand jury stage. Similarly, FISA cannot form the basis for litigating this challenge because neither its notice requirement nor its exclusionary mandate, 50 U.S.C. § 1806(c) and (e), apply at the grand jury stage. Finally, as to Section 3504, the government is obliged to affirm or deny whether Title III surveillance took place, but that requirement has, in the district court's view and in our own, been satisfied. The different claims lead to the same conclusion, namely that this grand jury enforcement action is not the appropriate place to raise a challenge to the alleged surveillance of Appellant #10. The broader claims advanced as to NSA surveillance are not necessary to the disposition of this appeal, and they must await another day.

### V.

Finally, the other eleven appellants argue in Appeal No. 06-2220 that the district court abused its discretion by finding them in contempt of its May 2, 2006 order. Appellants argue

that the order was ambiguous and that they did not know they were violating a valid decree when they failed to comply. These arguments simply are difficult to square with the facts of the record. Further, it is within the considered discretion of the district court to evaluate efforts made to comply with a subpoena and the amount of time reasonable for compliance.

Both parties agree that civil contempt must be shown by "clear and convincing" evidence of:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (alterations in original; internal citations omitted). When evaluating a district court's interpretation of its own decree, we are properly respectful of the district court's superior position to evaluate its order. *JTH Tax, Inc. v. H&R Block Eastern Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004).

Far from abusing its discretion, it appears that the district court was the very embodiment of patience. Although given verbally, the district court's May 2, 2006 instructions were direct, explicit, and left no doubt what was required. The district court stated, "I'm ordering [appellants] . . . to comply with the subpoena that's been served on them. I'm ordering them to appear before the grand jury at the next date[,] and I'm ordering them to produce the documents called for by the subpoena." It taxes the imagination to conceive of a way in which the district court could have been more explicit in its order, and appellants cannot argue that it was ambiguous or that it did not give them knowledge of what was required.

And if there were any question about what the district court meant, that doubt was removed only minutes later when the judge stated, "I'm going to order them [appellants] to appear May 4th. . . . [T]hey're ordered to appear before the grand jury and to produce documents." Yet a third time at that same hearing the court stated, "Ms. Luque's client is being given an *unambiguous, clear order* to comply [i.e., with the subpoenas]." (emphasis added).

Instead of immediately beginning production with a goal of completing it by May 4, appellants produced only a handful of materials before asking for an extension. Nor was the extension request supported by evidence that appellants were making all possible efforts to comply but simply did not have enough time to respond. Appellants later did argue the volume of documents was too large, but they could point to no significant efforts to comply in the preceding two days. Arguments that complete compliance was impossible in the time allotted do not excuse failure even to attempt compliance.

Nor can appellants convincingly argue that the district court's order was made ambiguous by the subsequent May 5, 2006 written order. That order, issued after appellants had already violated the May 4 deadline, stated that "[p]roduction must proceed *forthwith* and must be complete as counsel can make it no later than May 12, 2006." (emphasis in original). District courts "need only adopt a reasonable construction of the terms contained in their orders." *JTH Tax, Inc.*, 359 F.3d at 706 (citing *Cave v. Singletary*, 84 F.3d 1350, 1354 (11th Cir. 1996); *Michigan v. Allen Park*, 954 F.2d 1201, 1213 (6th Cir. 1992)). Regardless of whether the words "forthwith" and "complete as counsel can make it" introduced ambiguity, the district court was eminently reasonable in its October determination that a contempt citation was warranted. *Five months* of delay met neither the definition of "forthwith" nor "complete."

Finally, appellants cannot argue that they did not know they were required to turn over the documents their attorney had

stored on their behalf after the 2002 search warrants. The subpoenas clearly stated that appellants were required to "[p]roduce all responsive documents in the possession, *constructive possession*, custody or control of [each entity]." (emphasis added) (subpoena to Appellant #10). Furthermore, the subpoenas explicitly defined "constructive possession" as including "documents or records in the actual or physical possession of any of [the entities'] *agents*, employees, officers, directors, trustees, *attorneys*, bailees, designees, successors-in-interest, or any other person having actual or physical possession of its documents or records." (emphasis added).

Appellants had been in possession of the subpoenas since early 2006, or approximately three months by the time of the May orders and some eight months by October when they were finally held in contempt. When ordered to comply with the subpoenas in the explicit terms used by the district court, it is impossible to give credence to arguments that they were uncertain what was required. In light of such direct wording, there is no room to argue that the district court abused its discretion. The criminal justice system properly embodies virtues of patience and procedural fairness, but its attachment to due process does not countenance undue delay, and its intrinsic complexity shall not be used by appellants or any other to turn the system on itself. In sum, we commend the district court for its care in the face of trying circumstances, and we affirm its judgment for the reasons herein expressed.

*AFFIRMED*

TRAXLER, Chief Judge, concurring in part and dissenting in part:

The majority affirms both fines imposed in this case. I agree that the fine imposed on the eleven appellants other than Appellant #10 should be affirmed, and I therefore concur in Parts II, III, and V (except for the last sentence) of the majority opinion.

The issue I raise is this. When an aggrieved party claims that evidence it has been subpoenaed to produce before a grand jury is inadmissible because the subpoena is fruit of illegal electronic surveillance, 18 U.S.C.A. § 3504(a)(1) (West 2000) requires the government to affirm or deny that such unlawful surveillance occurred. To serve its purpose, § 3504(a)(1) requires an answer that is "factual, unambiguous, [and] unequivocal," *United States v. Apple*, 915 F.2d 899, 911 (4th Cir. 1990). Thus, in my view, when the government refuses to deny the illegal surveillance or provides an answer that is evasive, the aggrieved party has just cause to refuse to comply with the subpoena. I believe that the district court erred in ruling otherwise in this case and in holding Appellant #10 in contempt. Because I would vacate the fine imposed on Appellant #10 on that basis, I respectfully dissent in part.

## I.

### A.

More than forty years ago, Congress enacted a comprehensive scheme regulating wiretapping and electronic surveillance in Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III" or "the Act"). *See* Pub. L. No. 90-351, 82 Stat. 211 (1968); 18 U.S.C.A. §§ 2510-2522 (West 2000 & Supp. 2009). As is relevant here, "[e]xcept as otherwise specifically provided" in Title III, the Act makes it a crime to intercept wire, oral, or electronic communications or to disclose or use information obtained through such interceptions. 18 U.S.C.A. § 2511(1).[1] Title III also provides that nei-

---

[1]The Act identifies a number of exceptions to its general prohibition. For example, it authorizes the interception of a communication when the interceptor is a party to the communication. *See* 18 U.S.C.A. § 2511(2)(c), (d). An interception is also authorized when one of the parties to the communication has given prior consent, so long as the interceptor is acting under color of law or is not intercepting the communication for the purpose of committing a crime or tort. *See* 18 U.S.C.A. § 2511(2)(c), (d).

ther improperly intercepted communications nor the fruits thereof "may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, . . . or other authority of the United States." 18 U.S.C.A. § 2515; *see also* 18 U.S.C.A. § 2518(10) (providing procedures for moving to suppress such evidence).

As originally enacted, Title III provided that it did not "limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation . . . , to obtain foreign intelligence information . . . , or to protect national security information against foreign intelligence activities." Pub. L. 90-351, Title III, § 802, 82 Stat. 197, 214 ("the constitutional power exception"). In 1978, however, Congress enacted the Foreign Intelligence Surveillance Act of 1978 ("FISA"), Pub. L. 95-511, 92 Stat. 1783, in order "to curb the practice by which the Executive Branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it," S. Rep. No. 95-604(I). *See* 50 U.S.C.A. §§ 1801-1862 (West 2003 & Supp. 2009). FISA set forth a procedure under which the government could obtain warrants to conduct electronic surveillance for the purpose of acquiring foreign intelligence information. *See* 50 U.S.C.A. § 1802. It also established a court to review applications and issue surveillance orders upon demonstration by the government that, among other things, it had probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power." 50 U.S.C.A. § 1805(a)(2)(A).[2] FISA makes it a crime to "inten-

---

Title III further allows the interception, use, or disclosure of wire and oral communications by law enforcement when the officers are investigating enumerated crimes and obtain judicial approval, which may be given only when certain strict conditions are fulfilled. *See* 18 U.S.C.A. § 2516, 2518; *see also* 18 U.S.C.A. § 2511(2)(a), (b) (other exceptions).

[2] Each application by the government for a FISA order must contain, *inter alia*, a certification "that a significant purpose of the surveillance is to obtain foreign intelligence information" and "that such information cannot reasonably be obtained by normal investigative techniques." 50 U.S.C.A. § 1804(a)(6).

tionally . . . engage[] in electronic surveillance under color of law except as authorized by" statute.[3] 50 U.S.C.A. § 1809(a)(1).

With FISA's enactment, Congress amended Title III, repealing the constitutional power exception and replacing it with language excluding from Title III's scope (1) the conducting of electronic surveillance by a government employee in accordance with FISA, *see* 18 U.S.C.A. § 2511(2)(e);[4] (2) "the acquisition by the United States Government of foreign intelligence information from international or foreign communications"; (3) "foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system"; and (4) "utilizing a means other than electronic surveillance as defined in" FISA, 18 U.S.C.A. § 2511(2)(f).[5] Congress also added language specifying that statutorily provided procedures are "the exclusive means by which electronic surveillance, as defined in [FISA], and the interception of domestic wire and oral communications may be conducted." 18 U.S.C.A. § 2511(2)(f).

Also pertinent to this case is 28 U.S.C.A. § 1826(a) (West 2006), which provides, as is relevant here, that a federal court may hold a witness in a grand jury proceeding in contempt when he "refuses without just cause shown to comply with an order of the court to testify or provide other information."

---

[3]FISA creates a defense to prosecution for this crime for any "law enforcement or investigative officer engaged in the course of his official duties [when] the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order of a court of competent jurisdiction." 50 U.S.C.A. § 1809(b).

[4]The 1978 amendments also added 18 U.S.C.A. § 2511(2)(a)(ii), authorizing communication common carriers to provide information to certain persons.

[5]There is no language in Title III as amended that excludes from the scope of the Act the acquisition by the government of foreign intelligence information from domestic communications.

Considering 28 U.S.C.A. § 1826 and 18 U.S.C.A. § 2515 together, the Supreme Court has held that a witness has just cause to refuse to comply with a grand jury subpoena—and thus, cannot be held in contempt for refusing to comply—if the subpoena is based on information derived from electronic surveillance in violation of Title III. *See Gelbard v. United States*, 408 U.S. 41, 59-61 (1972).

In order to facilitate attempts to accomplish the otherwise difficult task of proving that evidence was obtained illegally, Congress passed the Organized Crime Control Act of 1970, *see* Pub. L. No. 91-452, tit. VII, § 702(a), 84 Stat. 922, 935-36 (1970), which provides, as is relevant here, that:

> In any trial, hearing, or other proceeding in or before any . . . grand jury, . . . upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act.

18 U.S.C.A. § 3504(a)(1). "[U]nlawful act" is broadly defined as "the use of any electronic, mechanical, or other device (as defined in [18 U.S.C.A. § 2510]) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto." 18 U.S.C.A. § 3504(b).

Claims asserted under § 3504 cannot be based on speculation, *see United States v. Pacella*, 622 F.2d 640, 643 (2d Cir. 1980), and before the government's obligation to affirm or deny is triggered, a party claiming to be the victim of an illegal interception must first establish that the interception affected his interests, *see United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990). To satisfy this standing requirement, an aggrieved party must assert "a definite 'claim.'" *Id.* A cognizable "claim" may be a mere assertion so long as it constitutes a "positive statement that illegal surveillance has taken

place." *Id.* The claimant, however, must also make a prima facie showing that he was "aggrieved" by the surveillance, meaning "that he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises." *Id.*

Once a claimant has made a cognizable claim, the government's response must be "factual, unambiguous, [and] unequivocal." *Id.* at 911. The government's failure to respond sufficiently to the claim constitutes just cause for the claimant to refuse to comply with the subpoena. *See In re Grand Jury Matter*, 906 F.2d 78, 91 (3d Cir. 1990) ("It is well settled that the government's failure to respond adequately to a claim of electronic surveillance constitutes just cause for refusal to comply with an order to provide evidence before a grand jury."); *cf. Apple*, 915 F.2d at 911 (vacating defendant's convictions when district court, without requiring government to sufficiently affirm or deny that any of her phone conversations were illegally intercepted, rejected her § 3504 motions asserting that evidence against her was obtained via illegal electronic surveillance).

B.

In early February 2006, counsel for the appellants ("Counsel") accepted service of the subpoenas *duces tecum* issued to her clients. In a letter to the government dated March 16, 2006, Counsel noted the then-recent revelations regarding the existence of "a secret warrantless wiretapping and electronic surveillance program in connection with alleged terrorist[] activities within the United States." J.A. 89. Counsel noted that "press reports and statements by Attorney General Alberto Gonzalez strongly suggest[ed] that the government [was] also engaging in secret warrantless surveillance of domestic communications as well" as international communications. J.A. 89. She therefore requested before she produced any documents that the government inform her

whether any of her clients had been, or still were, the subject of electronic surveillance under Title III, FISA, "the National Security Agency's recently disclosed domestic surveillance program or any other yet to be disclosed program." J.A. 89.

Counsel contended in the letter that "[t]he secret warrantless electronic surveillance discussed above violates Title III, FISA and the Fourth Amendment to the Constitution." J.A. 89. She further maintained that she and her clients "ha[d] reason to believe that the government ha[d] engaged – pursuant to the secret NSA program or otherwise – in illegal warrantless electronic surveillance of communications of not only [her] clients, but of [her] as well," which constituted "an 'unlawful act' as that term i[s] defined in 18 U.S.C. § 2510(5)." J.A. 89. Accordingly, "pursuant to 18 U.S.C. § 3504(a)," she "request[ed] that the United States immediately 'affirm or deny the occurrence of (any such) alleged unlawful act[s].'" J.A. 89 (second alteration in original). To the extent that she or her clients had been subject to such illegal surveillance, Counsel asked for "a full inventory, along with tapes, transcripts or other records, of any and all intercepted communications." J.A. 89. Counsel stated that the parties required the requested information "to determine not only the legality of any such surveillance but also whether any of the grand jury subpoenas are the fruits of any such illegal surveillance" and whether her clients' attorney-client privilege had been violated. J.A. 89.

The government responded with a letter dated March 27, 2006, acknowledging Counsel's position that her clients would not comply with the subpoena until the government advised her whether they "were or still are the subject of electronic surveillance under Title III, FISA, an NSA program, or any other yet to be disclosed program." J.A. 92. The letter stated that her clients "were not and are not a subject of electronic surveillance pursuant to Title III" but maintained that Counsel was "not entitled to notification of any other type of surveillance." J.A. 92. The letter added that even assuming

that her clients "*were* the subject of some other type of surveillance, they could not contest the legality of such surveillance at the grand jury stage." J.A. 92 (emphasis in original).

The government then moved *ex parte* for orders for the appellants to show cause why they should not be held in contempt for their alleged failure to comply with the subpoenas. The court subsequently ordered all of the appellants to comply with the subpoenas. Counsel informed the court on May 17 that only Appellant #10 would challenge its subpoena on the basis of the government's alleged illegal surveillance and its refusal to admit or deny the illegal surveillance. On June 7, Appellant #10 moved, on that basis, for a finding that it was not in civil contempt. Appellant #10 provided several reasons for its belief that it had been the subject of illegal government surveillance, many of which centered around its claim that it and its principals were a primary focus of the government's post-September 11 anti-terrorist efforts and therefore were very likely a target of the government's secret electronic surveillance. Appellant #10 pointed to the following facts:

  • the government's announced electronic surveillance program targeted people with known links to al Qaeda and related terrorist organizations;

  • following the September 11 attacks, Appellant #10, along with several alleged related entities and several of its alleged principals, were named as defendants in civil suits in which the government alleged it financially supported al Qaeda;

  • the government executed a search warrant on Appellant #10's offices in March of 2002 looking for evidence of money laundering, tax evasion, and the financing of terrorism;

- the government conducted searches the same day and the next day of the offices of several related entities and several of Appellant #10's principals;

- after the March 2002 searches, Appellant #10's principals were routinely detained when returning from travel, and Appellant #10's executive director on one occasion was detained and interrogated at an airport before a scheduled overseas flight, prompting a belief that they were on a terrorism watch list;

- after the March 2002 searches, Counsel and several individuals associated with Appellant #10 "heard strange noises, including clicking sounds" while talking on the telephone to Appellant #10's principals and while talking on their home phones, J.A. 455;

- in its separate prosecution of an associate of Appellant #10's, the government claimed to have intercepted 20,000 hours and 400,000 of the associates' calls using NSA surveillance.

In an October 2, 2006, order, the district court found that Appellant #10 established standing under § 3504 by asserting the occurrence of the illegal interceptions and by demonstrating a colorable basis for concluding that Appellant #10's communications were intercepted. The court determined, therefore, that Title III obligated the government "to affirm or deny the use of illegal electronic surveillance." J.A. 1023.

Although the court found that the government had "refused to address whether [Appellant #10] had been the subject of surveillance under presidentially approved warrantless interception of electronic communications" and had "refused to admit or deny whether [Counsel] herself, or any of her individual clients were subject to electronic surveillance," J.A. 1007, the court nonetheless ruled that the government's

response was sufficient. The court reasoned that the government was not required to admit or deny that Appellant #10 was the subject of electronic surveillance in violation of Title III or the Fourth Amendment because it was possible that the government's alleged surveillance was authorized by FISA or the inherent national security powers granted to the President by the Constitution. The district court ruled that the government was not required to admit or deny that it conducted electronic surveillance in violation of FISA because fruit of a FISA violation need not be excluded from a grand jury proceeding.

Finding that Appellant #10 had no just cause to refuse to comply with the subpoena, the court held Appellant #10 in contempt and fined it for its refusal to comply with the court's May 2 order, with the amount of the fine to increase daily until it fully complied.[6] Ultimately, the district court determined Appellant #10's total fine to be $18,000.

## C.

The appellants now argue that the district court erred in holding Appellant #10 in contempt without requiring the government to affirm or deny whether Appellant #10 was the subject of any illegal electronic surveillance. I agree.[7]

---

[6]The district court initially imposed a $3,000 fine on all 12 appellants collectively, with the fine continuing to accrue at a rate of $3,000 per day until they fully complied with the May 2 order. On November 6, 2006, when the district court ordered the contempt fine to stop accruing against the other eleven appellants, the court retroactively revised the fine against Appellant #10 to $1,000 per day from October 2, 2006, until it achieved full compliance. That same day, Appellant #10 complied fully.

[7]The government argues that the district court's determination that the government was not required to affirm or deny that it conducted unlawful electronic surveillance of Appellant #10 can be affirmed on the ground that, the district court's ruling notwithstanding, Appellant #10 did not actually establish that it was an "aggrieved" party. 18 U.S.C.A. § 3504(a)(1). Because I believe that the district court properly found that Appellant #10 made a prima facie showing that it was aggrieved by the government's surveillance, I would not disturb the district court's determination on that point.

IN RE: GRAND JURY SUBPOENA

Because the government failed to deny that Appellant #10 was the subject of any illegal electronic surveillance, our first order of business is to clarify exactly what facts the government did affirm or deny. As I have outlined, Counsel, in addition to requesting that the government affirm or deny that it subjected her or her clients to illegal electronic surveillance, requested that the government specifically inform her whether any of her clients had been, or still were, the subject of electronic surveillance under Title III, FISA, "the National Security Agency's recently-disclosed domestic surveillance program or any other yet to be disclosed program." J.A. 89. The government responded to the second question that Counsel's clients "were not and are not a subject of electronic surveillance pursuant to Title III," and refused to provide "notification of any other type of surveillance." J.A. 92. In so doing, the government clearly refused to affirm or deny the allegation that Counsel's clients had been the subject of illegal electronic surveillance, and the government also refused to answer whether they had been the subject of electronic surveillance pursuant to FISA, the government's announced extra-statutory surveillance program, or any other as-yet unannounced program. Thus, the only one of Counsel's questions that the government did answer was whether her clients had been, or still were, the subject of electronic surveillance *pursuant to* Title III, and the government answered that question in the negative.

To be clear, by answering only whether Counsel's clients were the subject of electronic surveillance *pursuant to* Title III, the government left unanswered Counsel's claim that her clients were subjected to electronic surveillance *in violation of* Title III.[8] *See Black's Law Dictionary* 1272 (8th ed. 2004)

---

[8]Besides leaving unanswered whether Appellant #10 was subjected to surveillance in violation of Title III, the response also left unanswered the question of whether Counsel's clients had been subjected to electronic surveillance in violation of FISA or the Fourth Amendment. Because I would hold that the government's response was rendered insufficient by its failure even to deny any Title III violation, I do not address whether a response denying any Title III violation would have satisfied the government's § 3504(a)(1) obligations.

(defining "pursuant to" as "[i]n compliance with," "in accordance with," "under," or "[a]s authorized by"). And even if the government's response could perhaps be read as denying that Appellant #10 was subjected to electronic surveillance in violation of Title III—and I believe the language of the government's response and the context in which it was given preclude that reading—the response certainly did not constitute the "factual, unambiguous, [and] unequivocal" denial that 18 U.S.C.A. § 3504(a)(1) required. *Apple*, 915 F.2d at 911.

It bears emphasis that, far from *negating* Appellant #10's Title III claim, the fact that the claimed surveillance was not conducted pursuant to Title III was *the essence of* Appellant #10's Title III claim. *To this day*, the government has never denied that Appellant #10 was the subject of electronic surveillance in violation of Title III. Nor has it ever done so indirectly by, for example, representing that any interceptions were of international or foreign communications only and were for the purpose of acquiring foreign intelligence. *See* 18 U.S.C.A. § 2511(2)(f) (excluding from Title III's scope "the acquisition by the United States Government of foreign intelligence information from international or foreign communications").[9] Indeed, the failure of the government even to deny intercepting Appellant #10's domestic calls is particularly noteworthy in light of Counsel's suggestion in her March 16 letter that the government was "engaging in secret warrantless surveillance of domestic communications as well" as international ones. J.A. 89.

As I have explained, when an aggrieved party makes a cognizable claim that a subpoena is fruit of a Title III violation and demands that the government affirm or deny that Title III

---

[9]To be clear, I do not mean to say that the government was obligated to specifically represent that the § 2511(2)(f) exception applied if it did. Rather, I mean only to point out that we cannot assume from the facts of this case, Counsel's allegations, or the government's response that § 2511(2)(f) or any other Title III exception applied.

was violated, the government's failure to do so provides just cause for the party to refuse to comply with the subpoena. *See In re Grand Jury Matter*, 906 F.2d at 91. No facts in this case warrant divergence from this well-established rule.

The district court correctly recognized that underlying this rule is the Supreme Court's holding in *Gelbard* that evidence that is the fruit of a Title III violation is inadmissible in a grand jury proceeding. However, in my judgment, the district court wrongly concluded that *Gelbard*'s holding did not apply to the facts of the present case. The district court reasoned that the *Gelbard* Court assumed for the purpose of its decision that the grand jury questioning that the witnesses sought to resist was fruit of an illegal wiretap, *see id.* at 46-47, but that such an assumption was not justified in the present case in light of the enactment of FISA and authorization by President Bush of his secret warrantless electronic surveillance program, both of which occurred after *Gelbard* was decided.

The *Gelbard* Court's assumption that the grand jury questioning that the witnesses sought to resist would have been fruit of a Title III violation was not at all dependent upon the fact that *Gelbard* predated FISA and President Bush's secret surveillance program. Nor did it depend in any way on the Court's view of the likelihood that the questioning at issue actually was fruit of an illegal interception. Rather, the *Gelbard* Court assumed the questioning was fruit of an illegal interception simply because the narrow issue before it was whether the witnesses would have just cause to refuse to testify *if the questioning were fruit of electronic surveillance in violation of Title III*. In the present case, as in *Gelbard*, we have not yet litigated the question of whether the claimed surveillance violated Title III. What is important is that *if the subpoena before us were the fruit of electronic surveillance that violated Title III*, Appellant #10 would have just cause to refuse to comply with it. *See id.* And, because the district court had not yet resolved Appellant #10's claim that it was the subject of surveillance that violated Title III, § 3504(a)(1)

clearly obligated the government to affirm or deny that claim, so that Appellant #10 was not forced to bear alone the very difficult task of proving government surveillance. *See United States v. Vielghth*, 502 F.2d 1257, 1259 n.4 (9th Cir. 1974) (per curiam) ("Requiring the government to affirm or deny the existence of illegal surveillance of witnesses imposes only a minimal additional burden upon the government, but requiring a witness to establish the existence of such surveillance may impose a burden on the witness that he can rarely meet, since, to be effective, electronic surveillance must be concealed from its victim."). Thus, the district court erred in concluding that the *possibility* that the government's surveillance was authorized by FISA or the Constitution somehow excused the government from admitting or denying Appellant #10's claim of illegal surveillance.

The district court also concluded that *United States v. Calandra*, 414 U.S. 338 (1974), demonstrates that *Gelbard* does not apply to the facts before us. I do not agree. In *Calandra*, the Court held that a witness does not have the right to refuse to answer grand jury questions on the basis that the questions were the fruit of an unconstitutional search and seizure. *See Calandra*, 414 U.S. at 350. The Court explained that its holding was not in conflict with *Gelbard*, which held that a grand jury witness could invoke § 2515 as a defense to a contempt charge resulting from his refusal to answer questions that were the fruit of electronic surveillance in violation of Title III. *See id.* at 355 n.11. The Court reasoned that the *Gelbard* holding "rested exclusively on an interpretation of [Title] III, which represented a congressional effort to afford special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance." *Id.* Because it is those very safeguards that Appellant #10 has attempted to invoke in this case, in which it claims its communications were intercepted in violation of Title III (among other laws), *Gelbard* clearly applies.

The government offers several additional arguments that its response satisfied its § 3504(a) obligations. First, it contends

that "Section 3504 does not apply to all electronic surveil-lance" and, in particular, does not apply to FISA surveillance. Brief of Appellee at 20. The government specifically asserts that § 3504 applies only to Title III claims, not to FISA or Constitutional claims (and thus, *Gelbard* does not control), and that a grand jury witness is not entitled to notice that he may have been overheard during the course of FISA surveil-lance. Neither of these arguments is valid, in my view.

Regarding the government's first argument, even assuming that § 3504 applies to Title III claims only, Appellant #10 has clearly claimed that its Title III rights were violated, and the government has never denied that allegation. The presence of this Title III claim renders irrelevant whether Appellant #10 could have utilized § 3504 had it alleged only a violation of FISA or the Constitution. As for the government's argument that Appellant #10 would not have been entitled to notice from the government that it overheard Appellant #10's calls under FISA, I believe that issue, like the issue of whether § 3504 applies to non-Title III claims, is a red herring. Deny-ing the occurrence of any *illegal* electronic surveillance of Appellant #10—or surveillance that violated Title III—would not have required admitting that any *legal* surveillance, such as that authorized by FISA, took place.

The government finally maintains that the imposition of the fine in this case should be affirmed because Appellant #10 could not have proven the illegality of the alleged surveillance under Title III, either because the warrantless electronic sur-veillance program announced by the Bush Administration was actually legal or because national security interests preclude Appellant #10 from litigating the legality of the program. This argument fails as well, however, for at least two reasons.

First, the process before the district court never reached the point at which Appellant #10 might have had to prove that the claimed surveillance violated Title III, because the govern-ment never denied that it did. Once the government failed to

offer a sufficient § 3504(a)(1) response, that failure gave Appellant #10 just cause to refuse to comply with the subpoena, independent of whether it could have proven that the claimed surveillance was illegal had the government denied any unlawful act. *See In re Grand Jury Matter*, 906 F.2d at 91.

Second, Appellant #10 has not alleged, and the government has never represented, that any surveillance conducted was pursuant to any *particular* surveillance program—or pursuant to any program at all, for that matter. Thus, Appellant #10's ability to prove the illegality of any particular program cannot be determinative of whether any surveillance of Appellant #10 was illegal. Indeed, when this red herring—the legality of any particular extra-statutory surveillance program—is stripped from this case, what we are left with is the garden-variety scenario of an aggrieved party claiming that its communications—perhaps its domestic communications—have been intercepted in violation of Title III, and the government refusing to deny that claim. I therefore believe that Appellant #10 certainly had just cause to refuse to comply with the subpoena, and the district court erred in holding it in contempt.

## II.

In sum, for the foregoing reasons, I believe that the government failed in its duty to adequately respond to Appellant #10's allegation that the subpoena here was the product of illegal government surveillance of Appellant #10. If a representation by the government that it did not conduct surveillance *pursuant to* Title III is deemed a sufficient response to a claim that it conducted surveillance *in violation of* Title III, then individuals will be crippled in their attempts to demonstrate that their communications have been unlawfully intercepted and § 3504 will serve no purpose. Established law dictates that the government's failure to offer an adequate response constituted just cause for Appellant #10 to refuse to comply with the subpoena, and that the district court therefore

erred in holding Appellant #10 in contempt for refusing to comply. On that basis I would vacate the fine imposed against Appellant #10, and I respectfully dissent from an affirmance of the imposition of that fine.[10]

---

[10]Because Appellant #10 has already fully complied with the subpoena, the vacatur of its fine would end its involvement in this case and require no further consideration by this court or the district court regarding whether the subpoena may have been the fruit of illegal electronic surveillance.